876 A.2d 818 (2005)
378 N.J. Super. 559
STATE of New Jersey, Plaintiff-Respondent,
v.
James MESSINO, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued May 31, 2005.
Decided June 30, 2005.
*823 Jeffrey B. Steinfeld, Hackensack, argued the cause for appellant (Rem Zeller and Winne, Banta, Rizzi, Hetherington & Basralian, attorneys;, Robert M. Jacobs, of counsel; Mr. Steinfeld, on the brief).
George H. Gangloff, Jr., Assistant Prosecutor, argued the cause for respondent (Sean F. Dalton, Prosecutor, Gloucester County, attorney; Mr. Gangloff, on the brief).
Before Judges PETRELLA, LINTNER and YANNOTTI.
The opinion of the court was delivered by
YANNOTTI, J.A.D.
Defendant James Messino was charged in a Gloucester County indictment with first-degree murder, contrary to N.J.S.A. 2C:11-3a(1)(2) (Count One), and second-degree endangering the welfare of a child, in violation of N.J.S.A. 2C:24-4a (Count Two). Following a trial before a jury, defendant was found not guilty of murder but guilty of aggravated manslaughter and endangering the welfare of a child. The judge sentenced defendant to a custodial term of twenty-two years, with a period of parole ineligibility as prescribed by the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2d. Defendant was sentenced on the endangering conviction to a consecutive term of seven years, with parole ineligibility as prescribed by NERA. Penalties were also imposed. Defendant appeals his convictions and the sentences imposed. We affirm.

I.
This matter arises from the death of D.R. on May 31, 1998. D.R. was born on April 19, 1996. His biological parents were Laurie Roberts and Mimi Mollo.[1] Roberts and Mollo ended their relationship before D.R. was born. Roberts met defendant in October 1997. They began dating and, in December 1997, they moved together with D.R. to an apartment in the basement of a home owned by Laurie's aunt, Elaine Roberts.
From the time of his birth, D.R. suffered from an enlarged scrotum resulting from "hydrocele" or fluid around the testicles. D.R. also suffered from a genetic disorder called Hunter's Syndrome, a form of mucopolysaccharidosis (MPS), which is a condition that affects the joints and bones and makes movement of the arms difficult. On May 29, 1998, two days before his death, D.R. underwent surgery to *824 reduce the size of his scrotum. Dr. Michael Louis Nance, a pediatrician at Children's Hospital of Philadelphia, performed the operation. The doctor testified that at the time of the surgery, D.R.'s scrotum was slightly enlarged and bruised and the bruising extended to D.R.'s lower abdomen. Nance stated that he observed blood in the tissues surrounding D.R.'s scrotum, which he had never seen when performing a hydrocele reduction procedure. Nance said that D.R.'s platelet count was normal. The child's blood clotting ability also was normal. Nance stated that the incision made during the operation was not near D.R.'s mesentery, the fibrous tissue that holds the small bowel in place and supplies blood to the bowel. D.R. was discharged from the hospital on May 30, 1998.
After D.R.'s release from the hospital, Roberts and defendant left D.R. at the home of Jean Mangini, Roberts' aunt. Roberts and defendant went home and went to sleep. D.R. was brought home around 9:30 in the evening. Roberts testified that defendant put D.R. to bed around 10:30 p.m. While D.R. slept, Roberts and defendant watched rented movies.
Around 5:30 a.m., the phone rang and D.R. was awakened. Roberts picked up D.R. to calm him and then she handed the child to defendant, who said he would put D.R. back to bed. Roberts went upstairs to the bathroom and, while she was in the bathroom, Roberts heard D.R. cry out. Roberts testified that she went back downstairs and asked defendant why D.R. had cried out. Defendant said that D.R. did not want to go to sleep. Roberts and defendant went to bed, but shortly thereafter Roberts heard D.R. making a gagging sound. She went to the child and saw that his body was "clenching and unclenching." Roberts thought that D.R. was having a seizure. Roberts and defendant called 911.
One of the paramedics who responded to the call testified that when he arrived at the apartment, D.R. was tossing, turning and crying. The paramedic said that D.R. looked pale and sickly. The initial physical check indicated that D.R. was in shock and he appeared to be bleeding internally. D.R.'s abdomen was distended and, according to the paramedic, there was a "very, very black and blue" bruise on the child's right flank. He stated that the bruise was round, oval-like and about three to four inches in diameter. D.R.'s testicles were "purplish," like a black color and "grossly swollen."
D.R. was taken to Kennedy Memorial Hospital. Dr. Frank J. DeMartino was the attending physician in the emergency room. He stated that, when he was brought in, D.R. was in a "very grave clinical state." He also observed the swollen testicles and a fair amount of bruising to the child's right flank. DeMartino asserted that D.R. was losing blood and the blood was collecting in the child's testicles, the abdominal area and the flanks.
Anita Brown, a registered nurse who attended to D.R. in the emergency room, testified that D.R. was "still and unresponsive" when he was first brought to the hospital. She noticed that D.R. had a huge bruise on the lower right abdomen, that was larger than a grapefruit and round in shape. Brown also noticed that D.R.'s scrotum was swollen and appeared to be filled with blood. Brown approached defendant and she asked him what happened but defendant did not reply. Brown testified that defendant was "very pale and very quiet." The medical personnel worked for an hour-and-a-half to resuscitate D.R. Their efforts failed and D.R. died.
An autopsy was performed at Children's Hospital of Philadelphia. Dr. Paul Hoyer, the assistant medical examiner for Gloucester *825 County, testified that the autopsy revealed that the surgical incision that had been made in the hydrocele procedure was open and gaping. The autopsy also revealed that about a quart of blood had collected in D.R.'s abdominal cavity. Hoyer observed a four-inch tear of the child's mesentery. He testified that in his opinion the tear had been caused by a "large blunt force," such as from a forceful kick or punch, a car accident or a fall from ten or fifteen feet. Hoyer also observed the bruise on D.R.'s abdomen and concluded that the child's death might be the result of child abuse and homicide. He asserted that D.R.'s death was not a "metabolic death." The cause of death was "hypovolemic shock."
Evidence also was presented at trial concerning injuries that D.R. had sustained in the months preceding his death. On February 2, 1998, D.R. was brought to Dr. Jeffrey P. Kovacs, an orthopedic surgeon, because he was having problems with a cast placed by another doctor to treat a fracture in D.R.'s left tibia. Kovacs examined D.R. and observed that the child's left upper thigh was "massively swollen." He found signs of a spiral fracture in D.R.'s left femur. The femur fracture was about a week old. The tibia fracture had been sustained about a month before the office visit. Kovacs testified that Roberts' vague account of the injuries made him suspect that she was not telling him the full story. Kovacs stated that it is uncommon to see two fractures in the same leg within a one-month period. Such an occurrence, he said, is "one of the hallmarks of child abuse." Kovacs opined that D.R.'s fractures were not "pathologic fractures" related to the child's MPS.
Dr. Paige Kaplan, head of the Biochemical Genetics Unit at Children's Hospital, treated D.R. in February 1998. She also concluded that D.R.'s fractures were not causally related to MPS.
Dr. Cindy Christian testified that she saw D.R. when he was admitted to Children's Hospital in February 1998. She consulted Kaplan who confirmed that there is no association between MPS and bone fractures. Christian stated that she became convinced, to a reasonable degree of medical certainty, that D.R. was a victim of child abuse. She asserted that, when D.R. was brought to the hospital on May 31, 1998, his platelet count was normal and he had no problem with blood clotting. Christian stated that a clotting problem was not the cause of the child's death. She also stated that the hemorrhaging in D.R.'s stomach was caused by the tearing of the mesentery. She asserted that such a tear could not have been caused by dropping a child of D.R.'s size ten inches onto a bed railing.
Dr. John Gregg is a pediatric orthopedic surgeon at Children's Hospital. He treated D.R. in February 1998 for the multiple fractures. Gregg testified that D.R. had normal bone density and his bones were not especially brittle. The child also did not have a problem with blood clotting. Dr. Gregg testified that, based on his observations, there was no doubt that D.R. had been physically abused.
The police commenced an investigation shortly after D.R.'s death. Roberts and defendant both agreed to accompany the investigating officers to the prosecutor's office for interviews. Defendant rode with Detective Sergeant Richard O'Brien. When he arrived at the prosecutor's office, defendant was taken to an interview room. Defendant was given a copy of the prosecutor's rights form and he was asked to read it aloud. Defendant did so and agreed to give a statement.
O'Brien and Investigator Kenneth E. Crane interviewed defendant and took a *826 taped statement in which defendant stated that when D.R. awoke on the morning of May 31, 1998, Roberts attended to D.R. while he went outside to smoke a cigarette. When defendant came back into the apartment, Roberts handed him the child and she went upstairs to the bathroom. Defendant said that D.R. was screaming because he did not want to part with his mother. He said that when Roberts returned, D.R. quieted down. After defendant went to bed, D.R. began making a heaving sound. Roberts thought D.R. was having a seizure and called 911.
During a break, Sergeant Alex Illas informed defendant that what he and Roberts told the police did not "add up." Defendant said that he wanted to smoke a cigarette. Illas accompanied defendant outside, where defendant asked Illas, "Do you think I need a lawyer?" Illas told defendant that it was his responsibility to tell defendant that he had a right to have a lawyer, but "that was his call." Defendant said, "What is going to happen to me if I tell you what happened?" Defendant became tearful and told Illas that he had dropped D.R. and D.R. struck the side of the bed.
In a second taped interview, defendant said that when Roberts went up to the bathroom, he attempted to put D.R. on the bed by holding the child with both hands, one on each side of the abdomen. According to defendant, D.R. squirmed in his hands, slipped from his right hand and fell. Defendant said that the child fell about one or one-and-a-half feet. Defendant asserted that D.R. hit the bed railing against his upper chest. Defendant said that he placed D.R. on his bed. According to defendant, D.R. cried at first and then calmed down. When Roberts returned, she and defendant went to sleep and shortly thereafter the child began to heave. They called 911.
Defendant did not testify at trial. He called two witnesses. Dr. Roger A. Berg testified as an expert in the field of radiology. He opined that the x-rays taken of D.R.'s tibia fracture indicated that it was a "toddler's fracture" which is common in children learning to walk. Berg stated that the femur fracture could have been caused by a fall.
Dr. John E. Adams, a forensic pathologist, also testified. He stated that D.R.'s abdominal injury was not consistent with a fist blow. He asserted that D.R. had some sort of blood clotting problem but he did not know its cause. He also stated that D.R.'s abdominal bruise could have been the result of striking the right flank against the rail of the bed when he fell from defendant's hands. Adams said that the patterns in the bruise were not the sort of patterns that could have resulted from a bare fist.
Adams also stated that that there were Hurley-Schleie cell deposits in the child's mesentery. The condition made the mesentery tissue thicker and shorter and therefore susceptible to injury from a lot less force than would otherwise be required for a major injury. Adams opined that, strictly speaking, the child had not suffered from a mesentery tear but rather from a rare bowel injury, where the bowel had been torn from the mesentery.
In this appeal, defendant raised the following contentions:
POINT ONE: THE TRIAL COURT ERRED IN NOT SUPPRESSING THE STATEMENTS GIVEN FOLLOWING INADEQUATE MIRANDA WARNINGS AND AT LEAST AN AMBIGUOUS REQUEST FOR COUNSEL.
POINT TWO: THE COURT ERRED IN CHARGING THE JURY BY A) FAILING TO INSTRUCT PROPERLY *827 ON THE ELEMENTS OF AGGRAVATED MANSLAUGHTER, B) GIVING CONFLICTING INSTRUCTIONS ON HOW TO CONSIDER THE LESSER OFFENSES, AND C) PROVIDING ERRONEOUS INSTRUCTIONS TO THE JURY ON THE ENDANGERING CHARGE.
POINT THREE: DEFENDANT'S DETERMINATION NOT TO SEEK A LESSER-OFFENSE INSTRUCTION SHOULD HAVE BEEN HONORED, GIVEN THE PROOFS AND POTENTIAL FOR A COMPROMISE VERDICT.
POINT FOUR: DEFENDANT RECEIVED AN ILLEGAL AND MANIFESTLY EXCESSIVE SENTENCE; THE CONVICTION FOR ENDANGERING SHOULD HAVE MERGED WITH THE MANSLAUGHTER CONVICTION, ALTERNATIVELY, THE SENTENCE ON COUNT TWO SHOULD HAVE RUN CONCURRENTLY, AND THE SENTENCE ON AGGRAVATED MANSLAUGHTER EXCEEDED WHAT WAS APPROPRIATE, IN VIEW OF THE MITIGATING FACTORS.
POINT FIVE: THE TRIAL COURT ERRONEOUSLY LIMITED THE CROSS-EXAMINATION OF CERTAIN WITNESSES FOR THE STATE, THEREBY MATERIALLY INTERFERING WITH DEFENDANT'S RIGHT OF CONFRONTATION UNDER THE SIXTH AMENDMENT.
POINT SIX: THE PROSECUTOR EXCEEDED THE BOUNDS OF PROPER ADVOCACY IN HIS EXAMINATION OF LAURIE ROBERTS AND ALSO MADE IMPROPER REMARKS IN SUMMATION.

II.
We turn first to defendant's assertion that his statements to the police should have been suppressed because the Miranda warnings failed to explicitly inform defendant that any statement could be used "against him." As stated previously, defendant was given a copy of the prosecutor's form and he was asked to read it aloud. The form stated in part that, "Anything you say can and will be used in a court of law." The trial judge found that, when he gave his statements, defendant was in custody. The judge further found that although he was not told that any statement made by defendant could be used "against him," defendant "clearly knew that statements could be used against him or at least could be used in court however they were going to be used." The judge found that defendant provided his statements "voluntarily, knowingly and intelligently."
The Fifth Amendment to the United States Constitution provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself...." U.S. Const., amend V. This privilege against self-incrimination applies to the states through the Fourteenth Amendment. Malloy v. Hogan, 378 U.S. 1, 6, 84 S.Ct. 1489, 1492, 12 L.Ed.2d 653 (1964). The right against self-incrimination applies to persons subjected to custodial interrogation. Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 706 (1966). The police must inform the suspect that he has a right to remain silent, that any statement may be used against him, that he has a right to an attorney, and an attorney will be provided if the suspect can not afford one. Ibid. A statement provided in custody is not admissible unless it is preceded by a knowing, intelligent and voluntary waiver of Miranda rights. State v. DiFrisco, 174 *828 N.J. 195, 235, 804 A.2d 507 (2002), cert. denied, 537 U.S. 1220, 123 S.Ct. 1323, 154 L.Ed.2d 1076 (2003).
Initially, we reject the State's assertion that defendant was not in custody when he gave his statements to the investigators. Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda, supra, 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706. The test of whether an individual is in custody for Miranda purposes is an objective test, which focuses on the totality of the circumstances. State v. P.Z., 152 N.J. 86, 102-03, 703 A.2d 901 (1997). The circumstances include the time and place of the interrogation, the length of the interrogation, the conduct of the interrogators and the status of the suspect. P.Z., supra, 152 N.J. at 103, 703 A.2d 901. "[C]ustody exists if the action of the interrogating officers and the surrounding circumstances, fairly construed, would reasonably lead a detainee to believe he could not leave freely." State v. Coburn, 221 N.J.Super. 586, 596, 535 A.2d 531 (App.Div.1987), certif. denied, 110 N.J. 300, 540 A.2d 1281 (1988).
Here, the evidence supports the judge's finding that defendant was subjected to a custodial interrogation. Defendant voluntarily agreed to accompany the police officers to the prosecutor's office for an interview. Defendant was not placed under arrest. At no point was defendant told that he was free to leave. Moreover, as the trial judge found, there was no practical way for defendant to leave the building "unless he was going to run from Woodbury to Franklinville," a distance of about 18 or 20 miles. In the circumstances, a reasonable person would not believe that he was free to leave.
We are convinced, however, that the warnings provided to defendant were sufficient to inform him of the substance of his constitutional rights. "[T]he words of Miranda do not constitute a ritualistic formula which must be repeated without variation in order to be effective. Words which convey the substance of the warning alone with the required information are sufficient." State v. Melvin, 65 N.J. 1, 14, 319 A.2d 450 (1974) (quoting United States v. Vanterpool, 394 F.2d 697, 698-99 (2d Cir.1968)). In this matter, defendant was informed of the substance of his Miranda rights. Defendant was told that any statement he made could be used in a court of law. Defendant could have readily inferred that any statement given to the investigators could be used against him.
Defendant's reliance upon United States v. Tillman, 963 F.2d 137 (6th Cir.1992), is misplaced. In that case, defendant was told he had a right to remain silent, he had the right to the presence of an attorney if he wished, he was not required to answer any questions and if he could not afford an attorney, one would be provided. Id. at 140. The defendant in Tillman was not given any warning about the use of his statements. Ibid. However, in this case, defendant was told that his statements could be used in a court of law, which in substance informed defendant that his statements could be used against him.
Defendant also argues that the interrogation should have ceased after he made what he contends was an ambiguous request for a lawyer. As we stated previously, after he made his first taped statement, defendant asked Sergeant Illas whether he thought that defendant needed a lawyer. When a suspect makes a statement that could be interpreted as a request for an attorney, the questioning must cease until an attorney has been *829 made available or the accused "initiates further communication, exchanges, or conversation with the police." State v. Chew, 150 N.J. 30, 61, 695 A.2d 1301 (1997) (quoting from Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378, 386 (1981)). An "equivocal request for an attorney is to be interpreted in a light most favorable to the defendant." Id. at 63, 695 A.2d 1301 (citing State v. Reed, 133 N.J. 237, 253, 627 A.2d 630 (1993)).
In our view, defendant's statement to Illas was not a request for an attorney. Defendant merely asked the officer whether he thought defendant needed a lawyer, an inquiry that readily may be distinguished from other statements considered to be requests for counsel. See Maglio v. Jago, 580 F.2d 202, 203 (6th Cir.1978) ("Maybe I should have an attorney."), and United States v. Clark, 499 F.2d 802, 805 (4th Cir.1974) ("I had better talk to a lawyer."). There is no dispute that defendant was told that he had a right to a lawyer. Defendant could have requested an attorney. His statement to Illas was not such a request.

III.
We turn to defendant's assertion that the trial judge erred in his jury instructions and that such errors warrant reversal of his conviction.
Defendant argues that the judge erred in his charge on aggravated manslaughter. It is undisputed that in his initial instructions, the judge did not instruct the jury on all of the elements of aggravated manslaughter. However, after commencing deliberations, the jury sent a question to the judge asking that he repeat the instructions on homicide. The judge read the entire instructions on murder, aggravated manslaughter and reckless manslaughter. The following day, the jury requested that the judge review "one more time, the full charge." The judge's instructions again included a full definition of aggravated manslaughter. Defendant argues that the charge was "prejudicially tainted" because, although the judge twice instructed the jury on aggravated manslaughter, the re-instruction did not inform the jury that this was "newly-instructed" material. We disagree.
The judge's initial failure to provide a complete instruction on aggravated manslaughter "cannot be dealt with in isolation" and the charge must be "examined as a whole to determine its overall effect." State v. Savage, 172 N.J. 374, 387, 799 A.2d 477 (2002). The standard for assessing the soundness of jury instructions is whether, in the circumstances, the jurors would understand the instructions as a whole. Ibid. We are convinced that, having been twice provided with full and correct instructions on the elements of aggravated manslaughter, the jurors can reasonably be expected to have understood the instructions for that offense.
Indeed, there is nothing in the record that suggests the jury was in any way confused by the instructions. Defense counsel did not ask the judge to highlight the fact that the judge's second and third reading of the instructions included material not included in the initial instructions. We are satisfied that the judge's failure to provide the complete definition of aggravated manslaughter in his initial reading of the instructions was harmless error.
Defendant next contends that the judge gave conflicting instructions on how the jury should deliberate on the murder charge and the lesser offenses. It is undisputed that the judge initially instructed the jury that they could consider the three charges together. However, the judge's later instructions essentially informed the *830 jury that it should consider the charges sequentially. We agree with defendant's assertion that the judge's instructions were to some extent contradictory. But any such inconsistency "cannot be dealt with in isolation." Savage, supra, 172 N.J. at 387, 799 A.2d 477.
We reject defendant's assertion that he was prejudiced by the instructions on the order of deliberations. The inconsistency was not material. It did not touch upon the substance of the charges, which remained consistent throughout. Moreover, it is not uncommon for a trial judge to suggest an order of deliberations. State v. Josephs, 174 N.J. 44, 91-92, 803 A.2d 1074 (2002). There is nothing inherently wrong with instructing a jury to consider offenses sequentially. Ibid. A danger may arise if a charge encourages a jury to convict on the first, and most serious charge, because the jury may believe defendant is guilty of "some" crime. Ibid. But that danger obviously was not present in this case. Defendant was not found guilty of the most serious charge. The inconsistency in the charge on the order of deliberations is not reversible error.
Defendant also argues that the instructions on the endangering charge were erroneous. We disagree. On the endangering charge, the judge instructed the jury in pertinent part:
The second element is that the defendant has a legal duty for the care of the child or assumed responsibility for the care of the child. A person having a legal duty for the care of a child means a parent or guardian. Parent or guardian means any natural parent, adoptive parent, foster parent, step-parent, or any person who has assumed responsibility for the care, custody or control of a child or upon whom there is a legal duty for such care. A person who has assumed the responsibility for the care of the child includes any person with whom a child is living at the time the offense is committed.
Defendant argues that the instructions failed to adhere to State v. Galloway, 133 N.J. 631, 628 A.2d 735 (1993), where the Court held that the second-degree endangering requires proof that the defendant assumed "a general and ongoing responsibility" for the care of the child and established a "continuing or regular supervisory or caretaker relationship" with the child. Id. at 661, 628 A.2d 735. Defendant asserts that the charge here was flawed because the instructions allowed the jury to find defendant guilty merely because defendant was living with D.R. at the time the offense was committed.
Again, we disagree. The Court in Galloway explained that "general and ongoing responsibility" for the care of a child may arise from informal arrangements "such as a person's cohabitation with the child's parent." Ibid. Although the trial judge here did not incorporate in his charge a statement regarding "general and ongoing responsibility" for a child, the instruction nevertheless required proof that defendant assumed responsibility for the "care, custody or control of a child," and specifically made reference to precisely the sort of informal arrangement that the Galloway Court stated would be evidence of "general and ongoing responsibility" for a child. The charge was proper.

IV.
Defendant also argues that the judge erred in charging the jury on the lesser offenses of aggravated and reckless manslaughter. Defendant opposed the State's request to charge on these lesser offenses, arguing that he was willing to take the risk of an "all or nothing" verdict. Defendant asserts that there was insufficient *831 evidence to support a verdict of aggravated or reckless manslaughter and therefore the jury should not have been charged on those offenses. We disagree.
As defendant concedes, it is not the strategic choice of either the defendant or the State that controls. "[T]he integrity of the justice system and the fact-finding process is not subordinate to the singular interests of the parties." State v. Garron, 177 N.J. 147, 180, 827 A.2d 243 (2003) (citing State v. Powell, 84 N.J. 305, 319, 419 A.2d 406 (1980)). "Very simply, where the facts on the record would justify a conviction of a certain charge, the people of this State are entitled to have that charge rendered to the jury, and no one's strategy, or assumed (even real) advantage can take precedence over that public interest." Powell, supra, 84 N.J. at 319, 419 A.2d 406.
If the charge is requested by the State, N.J.S.A. 2C:1-8d authorizes the judge to charge the jury if the offense is "included" in an offense for which defendant was indicted. However, "[t]he court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting defendant of the included offense." N.J.S.A. 2C:1-9(e). There must be rational basis in the evidence not only to convict the defendant of the lesser offense, but also to acquit the defendant of the charged offense. State v. Brent, 137 N.J. 107, 113-14, 644 A.2d 583 (1994).
Here, there was a rational basis in the evidence to charge the jury with the lesser offenses. To be guilty of murder, defendant must have knowingly or purposely inflicted serious bodily injury with actual knowledge that the injury created a substantial risk of death and that it was highly probable that death would result. State v. Jenkins, 178 N.J. 347, 363, 840 A.2d 242 (2004). To convict on a charge of aggravated manslaughter, defendant must have caused death with an awareness and conscious disregard of the probability of death. Ibid. If the defendant disregarded only a possibility of death, the result is reckless manslaughter. Ibid.
In this case, there was overwhelming evidence from which a jury could find that D.R. died as a result of the traumatic injury that caused a tear to his mesentery. In addition, there was evidence that supported a finding that D.R. sustained the injury in the early morning hours on May 31, 1998 when defendant was alone with the child. The jury could have determined that defendant inflicted the injury knowingly and intentionally but not with actual knowledge the injury created a substantial risk and a high probability of death. However, the jury could find beyond a reasonable doubt that defendant caused the injury by striking the child with force and that he did so with an awareness of and conscious disregard of the fact that the injury would probably cause the child's death. In short, there was a rational basis in the evidence to charge the lesser offenses.

V.
We next consider the issues raised in defendant's supplemental brief. Defendant first argues that the trial judge erred in limiting his cross-examination of Jean Mangini, Dennis Mangini and Dr. Paul Hoyer. Defendant contends that he was denied his right to confront these witnesses.
The right to confront a witness in a criminal trial is protected by the Sixth Amendment to the United States Constitution and Article 1, para. 10 of the New Jersey Constitution. State v. Harvey, 151 N.J. 117, 187-88, 699 A.2d 596 (1997). "The right to cross-examine is an essential *832 element of that right." Id. at 188, 699 A.2d 596 (citing State v. Budis, 125 N.J. 519, 530-31, 593 A.2d 784 (1991)). However, a defendant's right of confrontation does not permit unlimited cross-examination. Ibid. (citing Delaware v. Fensterer, 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15, 19 (1985)). The scope of cross-examination rests within the sound discretion of the trial judge. Ibid. (citing State v. Martini, 131 N.J. 176, 263, 619 A.2d 1208 (1993), cert. denied, 516 U.S. 875, 116 S.Ct. 203, 133 L.Ed. 2d 137 (1995)). We will not interfere with the trial judge's authority to control the scope of cross-examination "unless clear error and prejudice are shown." State v. Gaikwad, 349 N.J.Super. 62, 87, 793 A.2d 39 (App.Div. 2002).
Jean Mangini is Roberts' aunt. Jean testified concerning defendant's relationship with D.R. She stated that D.R. began to sustain certain injuries after Roberts started seeing defendant. The defense sought to cross-examine Jean about her interview with Investigator Crane, in which he asked if Jean had been told that defendant had a "criminal record." Defense counsel sought to establish that Jean's view of defendant had been affected by an alleged misrepresentation of defendant's record because defendant only had been arrested and he had not been convicted of a crime. Defense counsel also sought to question Dennis Mangini on this issue.
We are convinced that the judge did not abuse his discretion in limiting the cross-examination of Jean and Dennis Mangini. Both witnesses were questioned outside the presence of the jury concerning the investigator's comments. Jean testified that she had no recollection of the police mentioning defendant's criminal record. Jean also said that she had no bias against defendant based on the information provided by the police. Dennis testified that he did not recall whether the investigator mentioned that defendant had a criminal record. We are satisfied that in the circumstances, the limitation on cross-examination of these witnesses was appropriate.
We are likewise satisfied that the trial judge properly limited the cross-examination of Dr. Paul Hoyer. Defendant sought to question Hoyer on an allegation that he had improperly touched a body at an autopsy and then made sarcastic comments. The allegation was reflected in affidavits from six persons employed in the Medical Examiner's Office in Philadelphia. Defendant proposed to have the affiants testify that they had a negative opinion as to Hoyer's truthfulness. Defendant argues that he should have been permitted to explore these issues in cross-examination. However, as the judge found, defense counsel was not simply seeking to have individuals testify as to Hoyer's character for truthfulness but was instead endeavoring to introduce evidence of a lack of truthfulness arising from one allegedly bad act. Such evidence was properly excluded pursuant to N.J.R.E. 403 and N.J.R.E. 608. The judge did not abuse his discretion in limiting Hoyer's cross-examination.
Defendant additionally asserts that the judge erred in allowing the State to show Roberts autopsy photos of D.R. Defendant argues that he was prejudiced because Roberts became emotional when she was shown the photos. The judge found that the possible prejudicial effect of showing the photos to Roberts did not substantially outweigh the probative value of the evidence. N.J.R.E. 403. We agree. Roberts saw D.R. just before he was put to bed on May 30, 1998. She was asked whether she saw the bruises that were depicted in the autopsy photos. The evidence obviously was relevant to establishing that defendant was responsible for the *833 child's injuries and resulting death. In our view, the judge did not abuse his discretion in allowing the photos to be shown to Roberts.
Defendant further contends that the prosecutor commented improperly upon defendant's silence at the hospital on May 31, 1998. The prosecutor stated:
Anita Brown testified ... she testified about what her role was at the hospital that day. And basically what she told you was the doctors, and the people who were treating [D.R.], were looking for answers ... they asked the people who were with the child the night before what happened and they got no answers. This accident of falling on the bed rail, who got that answer? Sergeant Illas... when this child was being treated  being resuscitated and there's all these monumental efforts being done to try to save this child's lifethis man, [defendant] tells Sergeant Illas it was an accident. He sits there with his mouth shut. And he sits at the hospital with his mouth shut.
Defendant maintains that the prosecutor referred improperly to defendant's decision not to testify at trial. It is clear, however, that the prosecutor's comment was not directed at the defendant's failure to testify but rather at defendant's failure to tell the medical personnel at the hospital that the child had accidentally fallen from his hands onto the bed rail.
Defendant also asserts that the prosecutor's comments were improperly directed to his pre-arrest silence. We disagree. Evidence of pre-arrest silence, in the absence of official interrogation, does not implicate the defendant's right against self-incrimination. State v. Brown, 118 N.J. 595, 613, 573 A.2d 886 (1990). Such evidence may be admitted "if, when viewed objectively and neutrally in light of all circumstances, it generates an inference of consciousness of guilt that bears on the credibility of the defendant when measured against the defendant's apparent exculpatory testimony." Id. at 615, 573 A.2d 886. In this case, the evidence of defendant's silence at the hospital had a direct bearing on the credibility of defendant's statement to Illas that he accidentally dropped the child. The prosecutor's comments on this issue were proper.

VI.
We turn to defendant's assertion that his sentences are excessive. Defendant argues that his convictions for aggravated manslaughter and endangering the welfare of a child merge. We disagree. The overriding principle of merger analysis is that a defendant who has been convicted of one offense cannot be punished as if convicted of two. State v. Hill, 182 N.J. 532, 542, 868 A.2d 290 (2005) (citing State v. Brown, 138 N.J. 481, 561, 651 A.2d 19 (1994), overruled on other grounds, State v. Cooper, 151 N.J. 326, 700 A.2d 306 (1997)). We follow a "flexible approach" to merger and consider the elements of the crimes, the Legislature's intent in creating the offenses and the specific facts of each case. Ibid. We are further guided by the principle that "the Legislature may fractionalize a single criminal episode into separate offenses when the Legislature intends them to be punished separately and when the fractionalization does not offend constitutional principles." Id. at 543, 868 A.2d 290 (citing State v. Mirault, 92 N.J. 492, 504, 457 A.2d 455 (1983)).
Defendant argues that his convictions merge because the conviction of endangering the welfare of a child must have been based on the same evidence as the manslaughter conviction. We disagree. There was sufficient evidence to establish that *834 defendant had physically abused D.R. prior to May 31, 1998 and therefore committed separate and distinct crimes. State v. Bass, 221 N.J.Super. 466, 492, 535 A.2d 1 (App.Div.1987). Moreover, the convictions do not merge even if both convictions were based on evidence that defendant injured D.R. on May 31, 1998. See State v. Miller, 108 N.J. 112, 118-21, 527 A.2d 1362 (1987) (holding that convictions for aggravated sexual assault and endangering the welfare of a child which are based on the "same general conduct" do not merge because the latter offense is aimed not only at specific conduct but also at the violation of the duty owed by a responsible person to a child).
Defendant also contends that the judge erred in imposing consecutive sentences. We are satisfied, however, that the judge did not abuse his discretion in ordering that the sentences be served consecutively because the evidence established that D.R. was the victim of separate and distinct criminal offenses committed by defendant at different times. The sentences represent an appropriate application of the factors in State v. Yarbough, 100 N.J. 627, 643-44, 498 A.2d 1239 (1985), cert. denied, 475 U.S. 1014, 106 S.Ct. 1193, 89 L.Ed.2d 308 (1986).
We additionally are satisfied that the judge properly weighed the aggravating and mitigating factors when he imposed his sentences. His findings are amply supported by the record. The sentences are not manifestly excessive or unduly punitive and do not constitute an abuse of discretion. State v. O'Donnell, 117 N.J. 210, 215-16, 564 A.2d 1202 (1989); State v. Ghertler, 114 N.J. 383, 393, 555 A.2d 553 (1989); State v. Roth, 95 N.J. 334, 363-65, 471 A.2d 370 (1984).
Defendant further asserts that the judge erred in applying NERA to his conviction of endangering the welfare of a child. The version of NERA in effect at the time defendant committed the offenses applied to "violent crimes" in which the actor causes death or serious bodily injury, or uses or threatens the use of bodily injury. State v. Kane, 335 N.J.Super. 391, 398, 762 A.2d 677 (App.Div.2000). The statute was amended in 2001 and, instead of applying to certain "violent crimes," the statute provides a list of the specific crimes for which a NERA sentence must be imposed. N.J.S.A. 2C:43-7.2(d), as amended by L. 2001, c. 129. Endangering the welfare of a child is not listed as one of the predicate crimes. Ibid.
Defendant argues that the amendment shows that, when it enacted the original statute, the Legislature did not intend that endangering the welfare of a child would be considered a "violent crime." Again, we disagree. Before the statute was amended, NERA plainly applied to any "violent crime" in which the actor causes serious bodily injury. As the evidence shows here, endangering the welfare of a child can be a "violent crime." Indeed, the jury here made an explicit finding that defendant committed a "violent crime." In our view, NERA was properly applied in this case.
Affirmed.
NOTES
[1] Roberts also was charged with endangering the welfare of a child. She pled guilty to a charge of obstruction of justice, in violation of N.J.S.A. 2C:29-1. In exchange for the plea, the prosecutor agreed to dismiss the endangering charge. The prosecutor also agreed to recommend probation on the condition that Roberts testified truthfully at defendant's trial.