**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4091-14T3

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

TERREL MANN a/k/a TERRELL
MANN and TYRELL MANN,

    Defendant-Appellant.

_____

Argued May 8, 2017 — Decided  May 26, 2017

Before Judges Sabatino and Haas.

On appeal from Superior Court of New Jersey,
Law Division, Mercer County, Indictment Nos.
08-09-0837, 11-04-0359 and 12-03-0271.

Margaret McLane, Assistant Deputy Public
Defender, argued the cause for appellant
(Joseph E. Krakora, Public Defender, attorney;
Ms. McLane, of counsel and on the briefs).

Timothy F. Trainor, Assistant Prosecutor,
argued the cause for respondent (Angelo J.
Onofri, Mercer County Prosecutor, attorney;
Mr. Trainor, of counsel and on the brief).

PER CURIAM

Defendant Terrel Mann, who pled guilty to second-degree

unlawful possession of a weapon, N.J.S.A. 2C:39-5(b), appeals the

trial court's denial of his motion to suppress incriminating statements he provided to police after witnessing the fatal shooting of his brother by third parties. We affirm.

I.

The record from the trial court's suppression hearing presents the following salient chronology of events.

A.

On June 16, 2011, defendant's brother was shot in the neck by an unidentified group of assailants in the backyard of a residence in Trenton. Defendant was present at the scene and saw his brother fall to the ground after the gunshots hit him. Defendant removed his shirt to apply pressure to his brother's gunshot wound, and dragged his brother to the front of the residence. The brother ultimately died from the gunshot wounds.

Several Trenton police officers arrived at the scene at about 1:30 p.m. The first to arrive was Officer Tara Dzurkoc. According to Officer Dzurkoc's testimony at the suppression hearing, when she arrived, she saw "a black male laying on the ground face up and a woman . . . holding a bloody white t-shirt to his neck." The victim was in front of a home on that street, "on the sidewalk area[.]" Dzurkoc recalled that there were "a ton of people" gathered around the scene.

Dzurkoc testified that, while waiting for an ambulance, she noticed defendant in the crowd. Defendant "stood out" to her because "he had no shirt on, he had gray shorts on, and he was covered in blood."

Dzurkoc further testified that defendant, who was "very upset," said, "I saw who did it, and they're going to get it." She observed that defendant was "pacing in the street" and "cursing." Dzurkoc testified that she "attempted" to calm him down, but defendant was "just kind of blowing [her] off[.]" Defendant did not ask for medical treatment, nor did anyone meet with him "to determine if he was in shock[.]"

According to Dzurkoc, she asked defendant to "stay to the side" so she could "keep an eye on him because a detective would want to talk to him." Dzurkoc did not stay with defendant. Nor was defendant put in handcuffs or placed under arrest.

Dzurkoc testified that, at that point, she "felt bad for him and he was just a witness." She "didn't tell him to stay specifically or to leave." According to Dzurkoc, defendant could have left "if he wanted to[,]" and he was "detained by him just standing where I knew he was until a detective came."

Once another detective arrived, that detective spoke to defendant and transported him to the police station in a police vehicle. Defendant sat without handcuffs in the backseat of the

vehicle with his girlfriend, Deanna Mott, whom he wanted to come with him to the station. Dzurkoc testified that such a situation is "[d]efinitely not" how police customarily transport someone "under arrest or in custody[.]" In such instances, the suspect normally would be handcuffed and searched.

Another Trenton Police Officer, Yusaf Addar, testified that, when he arrived at the scene, a detective called him over and told him that there was "a witness that needed to be transported to [police] headquarters." Addar recalled that defendant and his girlfriend were already in the police vehicle, so Addar drove them to the station. According to Addar, both defendant and his girlfriend were "a little agitated" because "they wanted to know what was going on with the victim at the time." Defendant was not, however, "yelling or screaming or acting out like he was being violent."

Addar testified that defendant did not ask at any time to get out of the car, nor was he handcuffed. Mott also had her cellphone with her while in the vehicle. According to Addar, the trip from the scene to the station took "[m]aybe two minutes if that."

When they arrived at the station, Addar took defendant and Mott "through the back entrance where police officers enter" and into what is known as the robbery section of the station, an area where police only bring "witnesses or suspects." Addar waited

with them for ten or twenty minutes, because "the area they were in they're really not supposed to be back there by themselves unless they're in the company of a detective or an officer." Addar testified that while they waited, Mott used her cell phone "a lot."

Addar later collected and photographed defendant's clothing, which he did by bringing defendant into an interview room "for privacy[,]" although the door remained open. Addar collected defendant's pants and sneakers, and gave him a "paper suit" to wear. Defendant was "really calm and really cooperative throughout the whole process[,]" and according to Addar, was treated "like a witness" during their interactions.

James Francis, a Trenton Detective Sergeant, also testified on behalf of the State. Francis had previously worked in the homicide unit, and he responded to the shooting scene. Detective Edgar Rios was assigned to work on the investigation with Francis.[1] While searching the area, Francis located the "primary crime scene[,]" at which he found the victim's clothes and "numerous shell casings[.]"

According to Francis, after searching the crime scene, he returned to the station to interview witnesses. He first

---

[1] Rios was injured while on duty in 2013, and did not testify at the hearing.

interviewed Mott at Rios's desk, located "in the rear of the homicide office, right at the window." While Francis interviewed Mott, defendant was left in the "waiting area" with no "police guard."

Francis testified that the conversation with Mott was "very low key[,]" as he and Rios "tried to ascertain any information that she had regarding the incident." The interview took about an hour. Mott did not give a formal statement at the time, because she had to leave due to "childcare issues[.]" She returned another day and gave a formal statement.

Francis recounted that he and Rios drove Mott home after her interview, prior to interviewing defendant. After taking Mott home, Francis and Rios "reexamined the crime scene[,]" which was "two or three row homes away" from Mott's home. That took "[u]nder half an hour." According to Francis, they were gone for no more than one hour, because the crime scene was located approximately five minutes by car from the police station.

Upon returning to the station, Francis and Rios interviewed defendant at the same location they had questioned Mott. Francis testified that, generally, if a person is considered a suspect or in custody, he or she is interviewed in "one of three video

interview rooms." Francis did not read defendant his Miranda[2] rights prior to that interview, because the police "don't Mirandize witnesses." At that time, Francis and Rios did not have "any idea" that defendant was potentially more than a witness.

Francis explained that it was "normal" for detectives to take evidence from witnesses, such as defendant's clothing in this case. Francis gave defendant "a light jacket that was hanging up in the homicide conference room" to wear over the paper suit, because "[t]he air conditioner was on, [and] it was pretty cold."

According to Francis, defendant told them during the interview that, prior to the shooting, he ran into a person with whom he had gotten into a fight earlier in the week. When they ran into one another, they got into another fight, which Mott eventually broke up. Francis further testified that defendant stated that, as he and his group started walking away, the other group "started running towards them" so he and Mott went inside her house. Defendant then called his brother, who came to the area with his cousin. The three men then "went walking around looking for the guys" that defendant had been fighting earlier. They did not find the group, and as they were walking back towards

---

[2] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Mott's house, defendant heard "multiple gunshots coming from the alleyway" where his brother was walking.

Francis testified that defendant stated he then ran down the alley and saw his brother "on the ground firing at a group of men" in the alley. Defendant then "grabbed the gun and started firing at the same boys." Defendant could see that his brother was shot in the neck at the time.

As recounted by Francis, defendant then told the detectives that, once the other group ran away, defendant "drag[ged]" his brother out of the alley to the front of the house. Francis did not believe defendant's account, because "it just didn't make sense that his brother could still be returning fire with conceivably a life-threatening injury to his neck where blood was gushing out." Francis also did not believe that defendant "called his brother out to basically help him with a fight and then he lets him walk down an alleyway . . . by himself without backing him up or assisting him in any way."

Francis told defendant that his "story" was "not really adding up to the physical evidence[.]" According to Francis, defendant then "displayed like a little bit of defeat[,] maybe with his shoulder slouching and said okay I was — I was firing the gun." At that point, and after consulting with an assistant prosecutor, Francis read defendant his <u>Miranda</u> rights before asking any

additional questions. Francis testified that defendant did not make "any indication" that he wanted a lawyer or wanted to stop the conversation.

Francis and Rios then took defendant to an interview room, and began recording the interview. Defendant was not handcuffed at that point.

According to the transcript of that interview, Rios read defendant his Miranda rights, and then had defendant read them back before signing. At one point, Rios defined the term "coercion" for defendant, and then ensured that defendant understood its meaning by having defendant explain it back to the detectives.

After waiving his Miranda rights, defendant relayed to the detectives how the incident began with a fight between him and a member of the other group. Defendant stated in that interview that he called his brother for help, who showed up thereafter. According to defendant, his brother gave him a gun to "hold" prior to confronting the other group. Defendant then explained to the detectives how the altercation between the two groups ended with gunshots.

B.

Mott, defendant's girlfriend, testified on his behalf at the suppression hearing. As she described it, once the police arrived,

they put defendant in the police vehicle.  Mott went over to the vehicle to "try[] to calm him down and figure out why he was being put in the police car."  According to Mott, the police asked her to get in the car with defendant to "calm him down[.]"

Mott testified that one police officer then told another to "take [them] down to the police station."  Mott further testified that defendant said "he didn't want to go, but the cop said to him that they probably just want to talk to him when he get[s] down there."  Mott asserted on cross-examination that she did not have her phone with her when they went to the station.

According to Mott, the police took defendant into a different room when they arrived at the station.  Mott testified that, from where she was sitting, she could hear the police "yelling at [defendant] telling him that his story was bull[.]"  Mott also testified that defendant "tried to talk to [her] through the door and the cops removed [her] from right there" because she "couldn't talk to him[.]"  Defendant allegedly "asked to leave to go" to the hospital as well.  Mott further asserted on cross-examination that the police "told [defendant] that he couldn't leave until the gun appeared."

Mott testified that Officer Rios later came to her and told her she "was lying to him about who had the gun."  According to Mott, however, she had not previously spoken to the police, so she

was "confused" by that assertion. Mott further testified that she did not leave the station that day until "almost ten o'clock that night."

Lastly, defendant testified on his own behalf at the hearing. He asserted that he could not remember his initial conversation with the police at the scene of the shooting, because he was "stressed out and in shock[.]" According to defendant, he was "in the stage of blacking out" when an officer told him "to get in the car until you calm down." Defendant allegedly told them "no, I don't want to get in the car[,]" at which point the officers "put [him] in the car and from there [he] was still crying, yelling."

Defendant testified that, once he was taken to the station, he did not feel free to leave. However, he acknowledged that he did not ask to leave.

Defendant further testified that, while being questioned, the officers told him that his story was "bullshit." He claimed that he felt "threatened" at that point, because the officers allegedly told him that if he did not tell them the "right story" about what happened, they would charge him with his brother's murder, should he die from his injuries. According to defendant, he told the police at that point that he had "told [his brother] to pass [him] the gun and [he] gave it to somebody and they took it and ran off with it."

11

Defendant claimed that he was promised during his second interview with the officers that, if he gave them the gun, "they were going to let [him] go." According to defendant, he only gave the videotaped statement because he believed that "if [he] just gave them that statement, that would get [him] out of the police station quicker."

Defendant also testified that he did not understand the Miranda form that he signed, and he only signed it because he was "tired" and "exhausted." He further asserted that he asked for a lawyer "[a]t one point in time[,]" but could not remember when. Defendant's grandmother allegedly came down to the station at some point, although it is unclear if she arrived before or after defendant was given Miranda warnings, but the police allegedly "wouldn't let her up" to see him.

Defendant admitted on cross-examination that he had previously been arrested "several" times, and had been Mirandized on more than two prior occasions. One of those occasions occurred in December 2009, and a copy of the Miranda form used in that matter was admitted into evidence at this hearing. Defendant testified that, although the signature on that form from 2009 was his, he did not remember signing it.

C.

Apart from these fact witnesses, defendant and the State each presented competing expert testimony concerning the voluntariness of defendant's statements when he was interviewed at the police station. Defendant's expert, Dr. Kenneth Weiss, a forensic psychiatrist, noted that defendant's measured IQ scores are indicative of "borderline intellectual functioning[,]" although perhaps not severe enough to support a diagnosis of "intellectual disability." Dr. Weiss observed that, during his interview with defendant he "did not express himself clearly at all times[.]" He also displayed "difficulty understanding" some of Dr. Weiss's questions, although he did ask for clarification when that occurred. Having reviewed the videotape of defendant's recorded police interview, Dr. Weiss concluded that defendant "lacked cognitive ability" at that time, and "would not fully understand" what his rights were or how to exercise them. Dr. Weiss thus opined that defendant's waiver of his self-incrimination privilege was neither knowing nor intelligent.

By contrast, the State's forensic psychiatrist, Dr. Charles Martinson, had more favorable impressions of defendant's cognitive abilities. Dr. Martinson classified defendant as "probably somewhat below average in terms of overall intellectual functioning." Having likewise reviewed the interview videotape,

13

Dr. Martinson noted that defendant presented himself in a "calm and composed fashion," and did not appear so "emotionally overwrought" as to be unable to knowingly and intelligently waive his rights. Dr. Martinson found it significant that defendant had prior criminal encounters, including at least one prior experience being Mirandized by police. That prior experience, in which defendant had likewise been questioned after waiving his rights, bolstered the State's expert's conclusion that defendant's waiver in the present case was knowing and intelligent.

As additional proof on the voluntariness question, the State lastly presented testimony from a Pennsylvania police officer who had Mirandized defendant in one of his prior cases. The officer testified that, when he read defendant his Miranda rights, defendant seemed to understand, was paying attention, and was not upset. According to that officer, defendant was handcuffed during that particular waiver discussion and the subsequent interview.

D.

The trial judge, Hon. Andrew J. Smithson, issued a detailed oral decision on the motion to suppress on September 29, 2014. In the course of his ruling, Judge Smithson made several important credibility assessments. He found Mott's testimony "not convincing" and "not of any consequence." The judge specifically found that defendant's testimony was not credible, as his conduct

14

showed he was "capable of thinking and acting." The judge noted that, although defendant claimed he blacked out, he was still able to convince the police to allow Mott to accompany him to the station. The judge also noted that Mott was allowed to ride with defendant in the vehicle, which would be "very unusual if one were considered to be a suspect."

Based on the overall circumstances, Judge Smithson found that defendant was "a critical witness to what was going on, and he was treated that way." The judge noted that it was "not surprising" that "defendant would understand that the police wanted to talk to him, and there would be inconveniences involved[,]" because defendant was at the scene and likely had information about the shooting. As Officer Dzurkoc had testified, defendant told the police that he knew who shot his brother, so "[o]f course the police are going to talk to him[.]"

Judge Smithson concluded that defendant was not coerced by the police in any way. He did note that the police "may have allowed [defendant] to . . . harbor the belief that production of the handgun would be his key out of police headquarters." The judge found it significant that defendant had been Mirandized previously, "where he made understandable choices." On the whole, the judge found defendant's suppression testimony "utterly unconvincing[.]"

The judge also evaluated the opinions of the parties' competing experts, finding the testimony of Dr. Martinson to be more persuasive. The judge stated that he "could not disagree more" with Dr. Weiss's overall conclusion that defendant did not waive his rights knowingly and intelligently. The judge instead favored Dr. Martinson's contrary findings.

In sum, the trial judge determined that defendant had the status of a witness, not a suspect, when he was first questioned by the police and was not at that point subjected to custodial interrogation. The judge further concluded that defendant's subsequent waiver of his rights, after being given <u>Miranda</u> warnings, was knowing, intelligent, and voluntary. Consequently, the suppression motion was denied.

### E.

Following the court's ruling, defendant entered into a negotiated plea of guilty to second-degree unlawful possession of a weapon. As part of the plea agreement, the State dismissed the other count of the indictment, and agreed to recommend a five-year sentence, with a one-year parole ineligibility period, contingent on a Graves Act waiver. The Presiding Criminal Judge of the vicinage subsequently granted that waiver.

A-4091-14T3

On February 20, 2015, Judge Smithson sentenced defendant to the five-year term with a one-year parole disqualifier, consistent with the plea agreement. This appeal followed.

## II.

On appeal, defendant raises the following arguments for our consideration:

> POINT I
>
> BECAUSE TERRELL'S STATEMENTS WERE MADE DURING CUSTODIAL INTERROGATION AND WITHOUT A VALID WAIVER OF HIS RIGHT AGAINST SELF-INCRIMINATION THEY MUST BE SUPPRESSED.
>
> A. Pre-Miranda Statements.
>
> B. Post-Miranda Statements.
>
> REPLY POINT I
>
> TERRELL WAS IN CUSTODY BECAUSE THE POLICE TOOK HIS CLOTHES AND HIS SHOES. HIS SUBSEQUENT STATEMENTS WERE MADE WITHOUT A VALID WAIVER OF HIS RIGHT AGAINST SELF-INCRIMINATION AND MUST BE SUPPRESSED.

Having fully considered these arguments in light of the record, the trial court's credibility findings, and the applicable law, we affirm the denial of defendant's suppression motion. We do so substantially for the thoughtful reasons expressed in Judge Smithson's detailed oral opinion. We amplify his decision with several comments.

17

We must review a trial court's factual findings at the suppression hearing on defendant's self-incrimination claims under "a deferential standard." State v. Stas, 212 N.J. 37, 48 (2012). Our appellate function, on such matters, is simply to consider "whether the findings made could reasonably have been reached on sufficient credible evidence present in the record." State v. Locurto, 157 N.J. 463, 471 (1999) (quoting State v. Johnson, 42 N.J. 146, 162 (1964)). We owe "deference to those findings of the trial judge which are substantially influenced by his opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." Johnson, supra, 42 N.J. at 161; see also Stas, supra, 212 N.J. at 49. By comparison, "with respect to legal determinations or conclusions reached on the basis of the facts[,]" our review is plenary. Ibid. (citing State v. Handy, 206 N.J. 39, 45 (2011)).

Applying those standards of review here, we are satisfied that the trial court's credibility and other factual findings from the suppression hearing are well-founded and should not be disturbed. In particular, we uphold the court's forcefully-expressed determination that defendant, his girlfriend, and his psychiatric expert were less convincing than the State's witnesses. That determination is buttressed by the videotape of the post-Miranda interview of defendant, in which defendant

appears to respond voluntarily and lucidly to the officers' queries with no manifest indications of coercion.

We reject the State's argument that the officers' initial questioning of defendant at the police station before the <u>Miranda</u> warnings were given should be treated as a custodial interrogation requiring <u>Miranda</u> warnings. Viewing the "totality of circumstances[,]" <u>see</u> <u>State v. Presha</u>, 163 <u>N.J.</u> 304, 313 (2000), we agree with the trial court's assessment that defendant had the status of a witness, rather than a criminal suspect, when he was initially interviewed by the police.

As a general proposition, police officers do not necessarily place someone in custody simply by asking that person to accompany them to a police station. <u>See, e.g.</u>, <u>State v. Marshall</u>, 148 <u>N.J.</u> 89, 225-26, <u>cert. denied</u>, 522 <u>U.S.</u> 850, 118 <u>S. Ct.</u> 140, 139 <u>L. Ed.</u> 2d 88 (1997); <u>State v. Purnell</u>, 310 <u>N.J. Super.</u> 407, 421-22 (App. Div. 1998) (determining that the defendant was not in custody after police took him to a police station), <u>rev'd on other grounds</u>, 161 <u>N.J.</u> 44 (1999). Similarly, "[i]f the questioning is simply part of an investigation and is not targeted at the individual because she or he is a suspect, the rights provided by <u>Miranda</u> are not implicated." <u>State v. Timmendequas</u>, 161 <u>N.J.</u> 515, 614-15 (1999) (citing <u>State v. Pierson</u>, 223 <u>N.J. Super.</u> 62, 67 (App. Div. 1998)).

19

Defendant likens the circumstances in this case to those in State v. Hubbard, 222 N.J. 249 (2015), and State v. Messino, 378 N.J. Super. 559 (App. Div.), certif. denied, 185 N.J. 297 (2005). We find neither of those cases factually on point here. We acknowledge that in both Hubbard, supra, 222 N.J. at 271, and Messino, supra, 378 N.J. Super. at 573, as in this case, the defendant was brought to a police station after a victim was killed or severely harmed. However, in Hubbard, the detective's questions "roamed far from merely obtaining information that might assist [in] the [victim's] treatment." Hubbard, supra, 222 N.J. at 271. Moreover, the substance and nature of the interview in Hubbard were suggestive of a custodial interrogation. Id. at 272.

By contrast, there is ample support in the record for the trial court's finding that the nature and tenor of the officers' initial interview of defendant was consistent with treating him as a witness to his brother's shooting, rather than a targeted suspect. Defendant declared at the shooting scene that he knew who was responsible for the shots. He voluntarily came with officers to the police station, accompanied in the same squad car by his girlfriend, who was also a potential eyewitness. He was not handcuffed at any time. He was not placed in an interrogation room at the station.

The substance of the initial interview, fairly construed, was focused upon obtaining relevant information from defendant, who was a first-hand eyewitness and therefore a person who could assist in gathering the pertinent facts. When defendant revealed for the first time that he had held a gun and fired shots from it at the scene after his brother was harmed, the police appropriately terminated the session, issued <u>Miranda</u> warnings, and moved defendant into an interrogation room.

Likewise, there are significant differences here from the circumstances in <u>Messino</u>, in which a defendant made incriminating statements at a police station after his girlfriend's child had died of apparent blunt force trauma. We concluded in <u>Messino</u> that the questioning in that case amounted to a custodial interrogation. <u>Supra</u>, 378 <u>N.J. Super.</u> at 576-77. As a key part of our analysis, we focused on the fact that the police station was eighteen to twenty miles from the defendant's home, and that there was "no practical way for [him] to leave the building[.]" <u>Id.</u> at 576. Here, by comparison, the station was located only a few minutes by car from defendant's girlfriend's house. There were several people at his girlfriend's house earlier that day who might have been able to assist him. Moreover, according to defendant's version of the events, his grandmother had come down to the station to see him.

21

Defendant stresses that he was wearing a paper suit and that his bloody clothes and shoes had been taken away from him. Even so, the police acted reasonably in taking those items of apparel from defendant, for reasons of both hygiene and evidence preservation. Conceivably, defendant's girlfriend, mother, or some other third party could have brought him clothing and shoes. There is no indication that if defendant made such a request, the police would have denied it.

Defendant also emphasizes the delay of him waiting approximately four hours at the station before his interview was started. The testifying police officers provided a reasonable explanation for that delay, having decided to interview defendant's girlfriend first and take her home before turning to defendant. The police were also involved in ongoing investigatory activities at the scene of the shooting.

Although the four-hour delay was relatively long, there is no indication that defendant ever expressed impatience or a desire to leave while he was waiting. As the trial court found, defendant presumably had some incentive to remain and show the police that he could be of assistance to them, by locating the gun that had been used to shoot his brother. The fact that the officers expressed disbelief or skepticism in reaction to defendant's initial account of the events did not convert the situation to a

22

custodial interrogation.  As the judge found, defendant's version of what had occurred at the scene was not credible, and the officers reasonably had the same reaction.

In sum, we agree with the trial court that defendant was not the subject of a custodial interrogation until the point when that interview was halted and <u>Miranda</u> warnings were given.

We likewise concur with the judge's well-established findings that the post-<u>Miranda</u> questioning was not coercive, and that defendant voluntarily and intelligently waived his rights before the questioning was conducted.  Although defendant may have some cognitive limitations, the trial court had a reasonable basis to agree with Dr. Martinson's expert opinion that defendant was sufficiently knowledgeable to understand his rights and waive them.  Moreover, the video recording buttresses the judge's determination of a lack of coercion during the session.[3]

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[3] For sake of completeness, we do note our agreement with defendant that, if we had found the pre-<u>Miranda</u> questioning to comprise a custodial interrogation, the contents of the post-<u>Miranda</u> questioning would likewise require suppression.  <u>See</u> <u>State v. O'Neill</u>, 193 <u>N.J.</u> 148, 180-87 (2007) (enumerating various factors for such an assessment, including, notably here, the proximity in time between the pre-warning and post-warning statements and the failure of officers to inform a defendant that his pre-warning statements cannot be used against him).

A-4091-14T3