**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5069-16T3

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

CLETUS J. HONORE, JR.,

    Defendant-Appellant.

_____

Submitted March 19, 2019 – Decided May 1, 2019

Before Judges Fisher and Suter.

On appeal from Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 16-12-1550.

Joseph E. Krakora, Public Defender, attorney for appellant (Stephen P. Hunter, Assistant Deputy Public Defender, of counsel and on the brief).

Esther Suarez, Hudson County Prosecutor, attorney for respondent (Erin M. Campbell, Assistant Prosecutor, on the brief).

PER CURIAM

In the early morning hours of August 28, 2015 in Jersey City, Milton Ramirez was walking with his girlfriend to buy cigarettes when an approaching car slowed down. He could see that the driver's side window was open. Two people were inside: the driver and passenger. The driver looked at him. Ramirez saw a gun followed by a flash. He testified he was shot in the chest by the driver when he was only five to eight feet away. Ramirez did not recognize the driver nor did he have any idea why he was shot. He was not able to identify defendant from a photographic array. The bullet that injured him was never recovered.

The car drove off as Ramirez collapsed in the street. A patrolman testified that he and his partner were in the area because of an earlier report about shots being fired. They joined the chase of a silver Acura by three other police cars that had their lights and sirens activated. The patrolman's vehicle could not keep up to the chase. Shortly after, the patrolman saw that the Acura was turned around in the street facing the wrong way after it crashed. The driver's side window was down. Michael Lewis was being taken out of the passenger seat and another person, defendant Cletus J. Honore, Jr., was being placed in custody at a nearby storage facility. The officer found a Ruger single action pistol about ten feet from defendant's location.

A-5069-16T3

At the conclusion of a jury trial, defendant was acquitted of first-degree attempted murder, N.J.S.A. 2C:5-1(a)(1), but convicted on four other charges, including: second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b); second-degree possession of a handgun for an unlawful purpose, N.J.S.A. 2C:39-4(a); second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1); and second-degree eluding, N.J.S.A. 2C:29-2(b).[1] He was sentenced to ten years in prison subject to a five-year period of parole ineligibility for unlawful possession of a handgun. The aggravated assault and possession of a handgun charges were merged. Defendant was sentenced to a concurrent ten-year term for second-degree unlawful possession of a handgun with an eighty-five percent period of parole ineligibility and three years of parole supervision upon release; and a seven-year term for eluding that was also to be concurrently served.

Defendant appeals his convictions and sentence. He argues the court erred (1) by admitting in evidence statements he made to the police after his arrest, (2) by instructing the jury on "flight" without explaining the State's required burden of proof, and (3) by failing to properly weigh aggravating and mitigating

---

[1] The State withdrew the charge of third-degree receiving stolen property, N.J.S.A. 2C:20-7.

A-5069-16T3

factors resulting in an excessive sentence.  We reject these arguments and affirm.

I

"An appellate court reviewing a motion to suppress evidence in a criminal case must uphold the factual findings underlying the trial court's decision, provided that those findings are 'supported by sufficient credible evidence in the record.'" State v. Boone, 232 N.J. 417, 425-26 (2017) (quoting State v. Scriven, 226 N.J. 20, 40 (2016)).  We do so "because those findings 'are substantially influenced by [an] opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" State v. Gamble, 218 N.J. 412, 424-25 (2014) (alterations in original) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)).  "'A trial court's findings should be disturbed only if they are so clearly mistaken that the interests of justice demand intervention and correction.'" State v. A.M., __ N.J. __, __ (2019) (slip op. at 11) (quoting State v. Elders, 192 N.J. 224, 244 (2007)).  We owe no deference, however, to conclusions of law made by trial courts in suppression decisions, "which we instead review de novo." Boone, 232 N.J. at 426.

A-5069-16T3

"Under <u>Miranda</u>[2], prior to any custodial interrogation, an accused must be advised of the Fifth Amendment right to remain silent and to have an attorney present during questioning." <u>State v. Chew</u>, 150 N.J. 30, 61 (1997) (quoting <u>Michigan v. Mosley</u>, 423 U.S. 96, 103 (1975)). "The administration of <u>Miranda</u> warnings[3] ensures that a defendant's right against self-incrimination is protected in the inherently coercive atmosphere of custodial interrogation." <u>A.M.</u>, __ N.J. __ (slip op. 13). However, "[t]he burden is on the prosecution to demonstrate not only that the individual was informed of his rights, but also that he has knowingly, voluntarily, and intelligently waived those rights, before any evidence acquired through the 'interrogation can be used against him.'" <u>Nyhammer</u>, 197 N.J. at 400-01 (quoting <u>Miranda</u>, 384 U.S. at 479).

The waiver of <u>Miranda</u> rights "may 'never be the product of police coercion.'" <u>A.M.</u>, __ N.J. __ (slip op.13). A court must determine "whether the suspect understood that he did not have to speak, the consequences of speaking,

---

[2]  <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

[3]  The warnings include: "(1) that [the person] has the right to remain silent, (2) that anything he says can be used against him in a court of law, (3) that he has the right to the presence of an attorney, and (4) that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." <u>State v. Nyhammer</u>, 197 N.J. 383, 400 (2009) (quoting <u>Miranda</u>, 384 U.S. at 479).

A-5069-16T3

and that he had the right to counsel before doing so if he wished." Nyhammer, 197 N.J. at 402. As the Court in A.M. recently instructed: "[a]ccordingly, 'a valid waiver does not require that an individual be informed of all information useful in making his decision.' Instead, a knowing, intelligent, and voluntary waiver is determined by the totality of the circumstances surrounding the custodial interrogation based on the fact-based assessments of the trial court." Id. at 14-15 (internal citations and quotation marks omitted).

Detective Joseph Chadicamo testified at the Miranda hearing that he and his partner, Detective Ortega, questioned defendant after his arrest. From 3:46 a.m., when the videotaping started, until 4:08 a.m., when defendant signed the Miranda rights and waiver statement waiving his rights, Chadicamo testified that he and Ortega read defendant the charges against him and his rights, did not have any substantive conversation with defendant prior to advising him about his rights and did not make any promises or threats.

The videotape showed Chadicamo advised defendant about the charges against him, which included attempted murder. Defendant immediately reacted saying "attempt to murder? . . . I ain't trying to murder nobody, sir." As Chadicamo, and then his partner, read the warnings and waiver form to defendant, he continually tried to explain his lack of involvement with the

6

shooting. Many times the detective explained "we got to get through this first.

So if you want to talk and tell us your side of the story, this is your opportunity.

But we got to get through this first," meaning the explanation of his rights.

Defendant's argument centers on two portions of the videotape.

DETECTIVE CHADICAMO: These -- all these -- all things that we need to talk to you about and we can't do it until you sign. That's it. All right.

DEFENDANT: I don't carry guns. I don't shoot people. I can't even see my girl -- West Orange.

DETECTIVE CHADICAMO: --

MR. HONORE: Oh, my god. Do I need a lawyer to sign this?

DETECTIVE CHADICAMO: You don't need a lawyer. These are your rights.

DETECTIVE ORTEGA: These are your rights.

DETECTIVE CHADICAMO: You're right once you don't, you know, if you waive that right --

DEFENDANT: Yo --

DETECTIVE CHADICAMO: If you waive that right, that's right there. That just says you understand and you will talk to us.

DEFENDANT: If I talk to you are you -- believe anything I tell you cause it's god's truth, I'm telling you, bro.

7
A-5069-16T3

DETECTIVE ORTEGA: Yes.

DEFENDANT: Just don't try and trick me, please, yo.

The following exchange occurred shortly after that:

DEFENDANT: Please call my mother and my girlfriend and tell -- please.

DETECTIVE CHADICAMO: Once we speak to you, make your phone call and you can call your mother --

DEFENDANT: I didn't do attempted murder, no --

DETECTIVE CHADICAMO: Okay. That's fine. But you need to sign this. If you don't sign this our interview is over.

DEFENDANT: Oh, I don't need a lawyer to sign this?

DETECTIVE ORTEGA: You do not need a lawyer. These are your rights -- you have, look, these are all your rights. Look, read them here. There are 1, 2, 3 and 4 and 5.

DEFENDANT: Murder.

DETECTIVE ORTEGA: Okay?

Defendant told the detectives he wanted to talk to them and they explained he had to understand his rights first.

DETECTIVE CHADICAMO: Okay. Sign it and we can talk. That's it.

DEFENDANT: -- sign --

8

DETECTIVE CHADICAMO: I don't know -- everything -- everything is on tape right now.

DETECTIVE ORTEGA: Everything we're doing is to protect you right now, Cletus. If you don't – if you don't sign these rights that you understand these rights, we can't talk to you. You understand? That's the law. That is the law.

DETECTIVE CHADICAMO: We're not trying to break it. We're trying to follow it.

DETECTIVE ORTEGA: We have to give you this. This is your -- this is your constitutional --

DEFENDANT: -- got shot tonight.

DETECTIVE ORTEGA: We can't talk to you until you sign this, right? This is your constitutional right, your rights.

The detectives stepped out for defendant to "compose" himself. They explained he was going to go to the county jail whether he signed the warnings and waiver form or not, and he could place a call from the jail. Detective Ortega told defendant these were his rights "as a – as a human, as an American citizen." As the detectives completed the rights, defendant was asked more than once did he understand, responding "[o]h, good god," and then repeatedly saying, "I'm going to sign . . . I'm signing," and then "[c]an you just talk to me please?" Defendant signed the warnings and waiver form twice and wrote the word "yes." The detectives then questioned defendant about the shooting.

The court found defendant's waiver of his <u>Miranda</u> rights was "voluntary, knowing and intelligent." Although defendant did ask twice whether he needed an attorney to sign the warnings and waiver form, the court said this was not a request for counsel. The police were obligated only to "inform a defendant that he has the right to a lawyer." Defendant's only "confusion" was whether by signing the waiver he was admitting to attempted murder. The court observed that defendant appeared able to read and that the police were not aggressive to him.

Defendant contends Detective Chadicamo gave inaccurate and misleading responses to him when he asked if he needed a lawyer to sign the warnings and waiver form, and the detective said no. We do not agree that the exchange invalidated defendant's <u>Miranda</u> waiver.

"When a suspect makes a statement that could be interpreted as a request for an attorney, the questioning must cease until an attorney has been made available or the accused 'initiates further communication, exchanges or conversation with the police.'" <u>State v. Messino</u>, 378 N.J. Super. 559, 577 (App. Div. 2005) (quoting <u>Chew</u>, 150 N.J. at 61). However, a defendant has not requested an attorney when he simply asks the investigating officer for advice. <u>State v. Alston</u>, 204 N.J. 614, 625-26 (2009).

A-5069-16T3

In Alston, the defendant asked, "should I not have a lawyer in here with me?" immediately after acknowledging that he understood and waived his rights. 204 N.J. at 618. Although the detective asked whether defendant wanted a lawyer, he replied "No, I am asking you guys." Ibid. The Court held the defendant did not assert a right "ambiguous or otherwise" when asked should he have a lawyer. Id. at 625-26. "Rather, it was a question, posed to the investigating officer, that amounted to defendant's request for advice about what the detective thought that defendant should do." Id. at 626. The detective's response to defendant, "I can't make you" and "that's . . . on you" was "entirely appropriate under the circumstances." Id. at 626-27.

In Messino, the defendant asked the officer "do you think I need a lawyer," and he responded that was "[the defendant's] call." 378 N.J. Super. at 573. We held this interchange was not a request for counsel; defendant had been told he had a right to a lawyer and he could have requested one but did not. Id. at 578.

Defendant asked Detective Chadicamo for advice. Under Alston and Messino, this type of question did not constitute an "ambiguous" statement requesting an attorney. Defendant does not even argue this; his only argument is that it was misleading for Detective Chadicamo to respond to defendant that he did not need a lawyer to acknowledge he understood his rights. That

defendant wanted to speak with the police was abundantly clear from the transcript. Both detectives tried repeatedly to stop defendant from saying anything until he acknowledged his rights. The detective advised defendant he had the right to consult with an attorney and to have one present. The detective's response to defendant's question essentially was that defendant did not need an attorney to decide whether he needed an attorney. This response was not misleading nor did it change defendant's question into an ambiguous request for counsel. We agree with the trial court that defendant's waiver of his rights was not constitutionally infirm.

II

Defendant argues the court erred in instructing the jury about flight as evidence of consciousness of defendant's guilt. He argues the court should have explained that the State had the burden to prove flight by a preponderance of the evidence. Because defendant did not object to the flight charge once it was amended and did not raise the burden of proof issue before the trial court, we review this charge under the plain error standard to determine whether it was "clearly capable of producing an unjust result." R. 2:10-2.

In the statement played to the jury at trial, defendant told the detectives that he and his friend, Michael Lewis, drove in his Acura from West Orange,

where defendant lived, to Jersey City to visit defendant's girlfriend and that someone fired three shots at his car. Defendant claimed one of the bullets went through his car near his knee. When that happened, he rapidly drove out of the area because he thought someone was "chasing him, trying to kill him." He claimed he was not aware he was being pursued by the police. At some point, defendant lost control of his vehicle, and it turned around in the road, although he still did not see any police cars. He ran away from his car until he heard the police tell him to get on the ground, and he was arrested.

Defendant told the police that he did not have a gun. Later in the statement, he claimed that Lewis had a "long ass gun -- cowboy looking Will Smith gun --" with him. According to defendant, it was Lewis who leaned across from the passenger side in front of defendant and shot out of the driver's side window, striking a "random" person. Defendant drove away quickly. After the crash, Lewis told defendant to run with the gun.

Lewis' testimony at trial contradicted defendant's statement. He testified at trial that defendant had a black revolver on the night of the shooting. They were "hanging out" with defendant's girlfriend and others when "it got a little rocky" meaning they "got a little aggressive with [defendant and Lewis]." Defendant had a "shoving match" and "then it escalated." Lewis claimed that

13

defendant shot off three rounds from the gun. They got back in the car and left. Lewis testified that shortly after, defendant then shot a victim from the car who was not involved in the earlier incident. They drove off but then were pursued by the police until defendant had an accident with the car. After the crash, Lewis stayed with the car but defendant ran. Lewis testified pursuant to a plea deal.

When the State requested an instruction to the jury on flight as consciousness of guilt, defendant objected. His counsel argued that he did not flee the police because he thought the people who had shot at him were chasing him. The court rejected this argument but edited the proposed instruction because he observed that the defense did not have to suggest any explanation for the flight.[4]

The court instructed the jury as follows:

> Now, there has been some testimony in this case from which you may infer that the defendant, Mr. Honore, fled shortly after the commission of the crime. The defendant, Mr. Honore, denies that the acts constituted flight. The question of whether the defendant fled after the commission of the crime is another question of fact for you, the jury, to determine. Mere departure from a place where a crime has been committed does not constitute flight. If you find that the defendant, that's Mr. Honore, fearing that an accusation or arrest was

_____

[4] The court removed: "The defense has suggested the following explanation. The defendant was fleeing a dangerous scene. If you find defendant's explanation credible, you should not draw any inference."

A-5069-16T3

made against him on the -- on the charge involving the indictment took refuge and flight for the purpose of evading the accusation or arrest on that charge, then you may consider such flight in connection with all the other evidence in the case as an indication or proof of consciousness of guilt. Flight may only be considered as evidence of consciousness of guilt if you should determine that the defendant's purpose in leaving was to evade accusation or arrest for the -- for the offense charged in the indictment.

There has been some testimony in the case from which you may infer that the defendant fled shortly after the alleged commission of the crime. If after a consideration of all the evidence you find that the defendant, that's Mr. Honore, fearing that an accusation or arrest would be made against him on the charge involved in the indictment took refuge in flight for the purpose of evading the accusation or arrest, then you may consider such flight in connection with all the other evidence in the case as an indication or proof of a consciousness of guilt. It is for you as judges of the facts to decide whether or not evidence of flight shows a consciousness of guilt and the weight to be given such evidence in light of all the other evidence in this case.

Defendant did not object to this charge. A copy of the entire charge was provided to the jury during its deliberations.

"[A]ppropriate and proper [jury] charges are essential for a fair trial." State v. Baum, 224 N.J. 147, 158-59 (2016) (quoting State v. Reddish, 181 N.J. 553, 613 (2004)). In reviewing the adequacy of the judge's charge to the jury, we must consider the charge as a whole in determining whether it was

15

prejudicial. See State v. Figueroa, 190 N.J. 219, 246 (2007) (citing State v. Wilbely, 63 N.J. 420, 422 (1973)).

Instructions on flight "may be evidential of consciousness of guilt, provided the flight pertains to the crime charged." State v. Randolph, 228 N.J. 566, 594 (2017). A jury instruction on flight requires the jury to first find that there was a departure and then to find that the motive for the departure was an attempt to avoid arrest or prosecution on the charged offense. State v. Mann, 132 N.J. 410, 421 (1993) (citing State v. Wilson, 57 N.J. 39, 49 (1970)).

Defendant's counsel initially objected to the State's request for an instruction on flight because defendant's statement to the police indicated he was not fleeing the police but from people he claimed shot at him. The trial court disagreed because defendant continued to flee until he had an accident, and granted the State's request for an instruction. The proposed instruction included a few sentences that would have explained why defendant was fleeing. The court took those out because defendant did not have to suggest any explanation for flight. As edited, the flight charge was very similar to the model jury charge. Defendant did not object to the edited charge.

We do not agree that this charge warrants reversal of defendant's conviction because it did not separately address the burden of proof. The court

16

repeatedly instructed the jury that the State had the burden of proof on every issue. Before the summations by counsel, the court advised the jury that it was to decide "whether the State has proven the guilt of the defendant on each charge." In her closing, defendant's counsel reminded the jury that the court said "the State has the burden of proof here. I'm under no obligation." In the charge prior to the instruction on flight, the court explained that defendant was presumed innocent and that the State had to prove every element of the offenses charged beyond a reasonable doubt. He reminded the jury that the State's burden "never shifts to the defendant. The defendant does not have to produce evidence that proves the guilt of another." Very shortly after the flight charge, the court instructed the jury about the criminal code stating again that the State had to prove defendant was guilty of the crimes charged in the indictment beyond a reasonable doubt. Because defendant also was charged with the crime of alluding an officer, the court instructed the jury that the State had to prove beyond a reasonable doubt that defendant knew the police were pursuing him and knowingly fled or eluded the police.

Neither the court's instruction about flight as consciousness of guilt nor the model charge expressly said that the State had to prove flight by a preponderance of the evidence. However, we are to review the charge as a whole

17

to determine whether it was prejudicial. We think it was clear, looking at this charge as a whole, that the State bore the burden of proof throughout the trial and that the lack of a specific instruction about burden of proof within the flight charge did not prejudice defendant. If anything, because defendant had been charged with alluding, the jury could well have thought the State had the burden to prove all flight by proof beyond a reasonable doubt. Thus, considering the flight charge[5] in the context of the entire jury charge, there was no error, much less plain error, "clearly capable of producing an unjust result." R. 2:10-2.

### III

At the sentencing hearing, the court found aggravating factor number three, the risk that defendant will commit another offense, N.J.S.A. 2C:44-1(a)(3), because the jury convicted him of four crimes and there was a risk he would commit another offense. The court also found aggravating factor nine, the need for deterrence, N.J.S.A. 2C:44-1(a)(9), because defendant was a young man and there was a need to deter him and others from violating the law, possessing a gun, and severely injuring a victim. The court found mitigating factor seven, no adult criminal record, N.J.S.A. 2C:44-1(b)(7), because

---

[5] In responding to defendant's argument, we do not mean to suggest that we believe the preponderance standard applies instead of the reasonable-doubt standard. On that question, we neither express nor intimate any view.

defendant had no adult criminal record, although he did have a record as a juvenile. The court stated it was not double counting any aggravating factors under State v. Fuentes, 217 N.J. 57 (2014), because it did not find factor one, the nature of the crime must be heinous, N.J.S.A. 2C:44-1(a)(1), or two, a unique harm inflicted on an individual, N.J.S.A. 2C:44-1(a)(2), even though the shooting was "totally senseless." The court analyzed the Yarbough[6] factors and decided that defendant's sentences all were to be concurrent.

We do not agree with defendant's argument that his sentence was excessive and review the judge's sentencing decision under an abuse of discretion standard. Fuentes, 217 N.J. at 70. We must determine whether:

> (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3)"the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [Ibid. (alterations in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

The sentencing guidelines provide that a person who has been convicted of a second-degree crime may be sentenced to a term between five and ten years.

---

[6] State v. Yarbough, 100 N.J. 627, 643-44 (1985).

N.J.S.A. 2C:43-6(a)(2). All of defendant's convictions were second-degree crimes. He was sentenced to two ten-year terms and a seven-year term, all to be served concurrently. This was within the guidelines.

Defendant contends the court did not properly weigh the aggravating and mitigating factors. "A judge's sentencing analysis is a fact-sensitive inquiry, which must be based on consideration of all the competent and credible evidence raised by the parties at sentencing." State v. Jaffe, 220 N.J. 114, 116 (2014). Where the aggravating factors predominate, the sentence imposed can be toward the higher end of the range, giving appropriate weight to all the factors. State v. Case, 220 N.J. 49, 64-65 (2014).

The court found aggravating factors three, the risk that defendant will commit another offense, and nine, the need for deterrence, and mitigating factor seven, no adult record. We are satisfied the court did not abuse its discretion in finding these factors and sentencing defendant. There was evidence that defendant simply shot randomly at the victim hitting him in the chest at close range. The court noted the need to deter defendant and others from this type of senseless crime. The court took into consideration that defendant was convicted of multiple offenses. Although defendant did not have a record as an adult, and the court counted that among the mitigating factors, defendant had been

20

adjudicated as a juvenile. The court also carefully considered the factors under Yarbough in crafting an aggregate sentence that was at the high end for a second-degree crime but where all the sentences were to be served concurrently. On this record, the court neither abused its discretion in sentencing defendant nor did the sentence shock one's conscience, given the offenses.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

21