SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

**State v. Laura Gonzalez (A-47-20) (085132)**

**Argued October 26, 2021 -- Decided February 8, 2022 -- Revised August 8, 2022**

**SOLOMON, J., writing for a unanimous Court.**

The Court considers whether defendant Laura Gonzalez invoked her right to counsel during a police interview and whether certain evidence should have been suppressed as a result. The Court also considers defendant's challenges to other evidentiary determinations and jury instructions by the trial court.

In January 2017, Seth and Lisa B. hired defendant as an in-home nanny. On Thanksgiving morning that year, their son Tommy, who was less than a year old, cried whenever his leg was touched. The parents brought Tommy to a pediatrics office, where Dr. Aliah Khan noted that Tommy had two bone fractures and insisted that the parents take him to the hospital, where a third fracture was discovered. Detective Iris Reyes of the Somerset County Prosecutor's Office met the parents at the hospital and interviewed them about Tommy's injuries. Detective Reyes interviewed defendant at the Somerset County Prosecutor's Office a few days later.

Defendant agreed to provide a videotaped statement after waiving her Miranda rights. Defendant initially denied any responsibility for Tommy's injuries. As the interview continued, however, Detective Reyes told defendant that video surveillance cameras in the home captured footage of her interactions with Tommy; in truth, no cameras existed in the home.

During the interview, before defendant made any incriminating statements, Detective Reyes stated that if defendant lied, "[t]he situation is going to get worse." Defendant then asked, "But now what do I do about an attorney and everything?" Detective Reyes responded, "That is your decision. I can't give you an opinion about anything," and added that defendant would "have a better option by telling the truth."

Eventually, defendant acknowledged that she was "full of anger" and admitted to shaking, swinging, hitting, suffocating, and throwing Tommy. Near the end of the interview, Detective Reyes asked defendant if she wanted to write the B. family a note. Defendant agreed and wrote a note in which she described herself as a monster and expressed "hope God forgive[s] me and all that I did."

1

Defendant was charged with endangering and aggravated assault. Before trial, defendant moved to suppress portions of her statement to Detective Reyes and the note to the parents, arguing that both were made after she invoked her right to counsel. Following a Miranda hearing, the court denied defendant's motion.

At trial, the State played defendant's recorded statement, read the note aloud, and provided the jury with a transcript of defendant's statement. Also relevant to this appeal were statements made during trial by Lisa and Seth over defense counsel's objections, and the testimony of Dr. Gladibel Medina, the State's expert in general pediatrics with a subspecialty in child abuse pediatrics.

Specifically, on direct examination, Lisa testified that upon discovering the fracture of Tommy's left leg, Dr. Khan told her that "it was clear child abuse." Then Lisa was asked whether Dr. Khan told her anything about the fracture. Defense counsel objected, but the court found that the hearsay statements were admissible as statements made for purposes of medical diagnosis or treatment under N.J.R.E. 803(c)(4). In response to the question, Lisa testified that she was told the abuse was intentional. Following Lisa's cross-examination, the court instructed the jury that the statements by Dr. Khan to which Lisa testified "were admitted not for the truth of the matter asserted but to explain the actions that this witness took subsequent to hearing those statements."

Seth B. then testified that Dr. Khan told him, "This is, basically, textbook child abuse." Defense counsel objected at side bar, and the court agreed to strike Seth's testimony and instructed the jury that the quote could not be considered by the jury in any deliberations; the jurors responded that they could follow those instructions.

Dr. Medina testified as the State's expert in pediatrics with specialized knowledge in child abuse. When asked whether she had an opinion "within a reasonable degree of medical certainty" as to what caused the injuries to Tommy's right femur, Dr. Medina testified that "the only mechanism of trauma that was reported on the records" was the description by defendant in her interview of what she had done to Tommy. Dr. Medina testified that Tommy's injuries could have been caused by the actions defendant described and that those actions were not consistent with "normal caregiving activity."

The jury found defendant guilty of endangering the welfare of a child and of simple assault. Defendant appealed, and the Appellate Division affirmed both the trial court's decision to deny defendant's motion to suppress and the trial court's rulings as to the disputed testimony at trial. The Court granted certification, 245 N.J. 466 (2021), limited to whether defendant's statement and letter of apology should have been suppressed because defendant sufficiently invoked her right to counsel, as well as whether the trial court erred in admitting testimony by Dr. Medina regarding ordinary caregiving; in admitting testimony by Seth and Lisa as to what Dr. Khan told them; and in the form of its cautionary instruction regarding hearsay testimony by Seth.

2

**HELD:** Defendant's question about the attorney was an ambiguous invocation of her right to counsel. Under settled New Jersey law, see, e.g., State v. Reed, 133 N.J. 237, 253 (1993), the detective was required to cease questioning and clarify whether defendant was requesting counsel during the interview. Because the State played defendant's recorded statement at trial and read the apology note -- written at the detective's suggestion -- to the jury, the error in failing to suppress that evidence was harmful. The Court also finds plain error in the trial court's admission of certain challenged evidence, and it provides guidance for the proceedings on remand.

1. If a person subject to custodial interrogation "states that he wants an attorney, the interrogation must cease until an attorney is present." Miranda v. Arizona, 384 U.S. 436, 474 (1966). "The United States Supreme Court has drawn a strict line to identify what will qualify as a request for counsel." State v. Alston, 204 N.J. 614, 620 (2011). Under the federal bright-line rule, officers must stop questioning a suspect only when the suspect's request for counsel is "unambiguous or unequivocal." Davis v. United States, 512 U.S. 452, 461-62 (1994). If a suspect makes an ambiguous or equivocal statement regarding the right to counsel, officers are under no obligation to stop questioning him. Id. at 462. (pp. 16-17)

2, In State v. Chew, the New Jersey Supreme Court rejected the standard enunciated in Davis and continued to require, in accordance with state precedent, that interrogators conduct an appropriate inquiry into a suspect's ambiguous invocation of the right to counsel. 150 N.J. 30, 63 (1997). Under New Jersey's more flexible approach, a suspect need not be articulate, clear, or explicit in requesting counsel; any indication of a desire for counsel, however ambiguous, will trigger entitlement to counsel. The Court provided guidance in Alston and reaffirmed that, in situations where "a suspect's statement 'arguably' amount[s] to an assertion of Miranda rights," conducting a follow-up inquiry is the only way to ensure that a suspect's waiver of their right was knowing and voluntary. 204 N.J. at 621-23. The Court instructed that where the suspect's "statements are so ambiguous that they cannot be understood to be the assertion of a right, clarification is not only permitted but needed." Id. at 624. The Alston Court noted, however, that officers are under no obligation to give a suspect advice about whether he should assert any of his rights. Id. at 628. (pp. 17-20)

3. Here, defendant's first mention of counsel, "[b]ut what do I do about an attorney and everything?" was an ambiguous invocation of her right to counsel that required the detective to cease all questioning and seek clarification. Defendant did not seek an opinion about whether she should have a lawyer present, but rather inquired about the availability of counsel. Additionally, defendant's query made it unclear whether she wanted an attorney present at that time or in the future. Thus, defendant's statement was "arguably" a request for counsel. Although the detective was under no obligation to give defendant any advice about obtaining counsel, she was required to cease the interrogation and ask follow-up questions to clarify defendant's obstruse statement regarding counsel.

3

Because the detective made no further inquiry, all portions of defendant's statement made thereafter, as well as defendant's note of apology to the parents, should have been excluded at trial; admitting the evidence was plain error. (pp. 20-22, 28)

4. With respect to the testimony by Dr. Medina, an expert witness may not base testimony on inadmissible evidence. Here, Dr. Medina relied on inadmissible evidence from defendant's statement in forming her opinion as to how Tommy developed his injuries. The admission of her testimony constituted plain error, requiring reversal. Further, Dr. Medina, an expert in general pediatrics with a subspecialty in child abuse pediatrics, should not have been permitted to opine on the obvious when noting that "normal caregiving" doesn't involve throwing or pulling a child's legs, because that is a subject within the ken of the average juror. (pp. 23-25)

5. Turning to the hearsay testimony of Lisa and Seth about what Dr. Khan told them, N.J.R.E. 803(c)(4) admits hearsay testimony that is "reasonably pertinent to . . . medical diagnosis or treatment" and describes "past or present symptoms or sensations; their inception; or their general cause." In a case such as this, the rule is directed at patients and cannot be used to introduce hearsay statements by physicians. Further, N.J.R.E. 803(c)(4) does not permit testimony as to the cause of physical symptoms. N.J.R.E. 803(c)(4) does not apply here, and the trial court abused its discretion by admitting Lisa's hearsay statement about what Dr. Khan said. Conversely, the trial court promptly struck Seth's testimony that Dr. Khan told him "[t]his is, basically, textbook child abuse," and issued "firm, clear, and prompt" curative instructions. (pp. 25-28)

**REVERSED and REMANDED to the trial court.**

**JUSTICE ALBIN, concurring,** joins the opinion of the Court in full but writes to highlight the use of lies by Detective Reyes during the interrogation. First, Detective Reyes told defendant that telling the truth would help her and similar statements that flatly contradicted the Miranda warnings. Justice Albin stresses that, although defense counsel did not raise the issue, that is a clear violation of the Court's jurisprudence. See State v. L.H., 239 N.J. 22, 47-48 (2019). Second, Detective Reyes told defendant that surveillance cameras captured her conduct although there were no cameras in the home. Justice Albin raises questions about the Court's current jurisprudence, which "gives officers leeway to tell some lies during an interrogation," see id. at 44, and expresses the view that the Court will have to decide, when the issue is fully presented, whether the continued use of lies and trickery is a constitutionally permissible practice -- whether it is a principled and sufficiently reliable means of inducing a truthful confession from a suspect.

**CHIEF JUSTICE RABNER and JUSTICES ALBIN, PATTERSON, FERNANDEZ-VINA, and PIERRE-LOUIS join in JUSTICE SOLOMON's opinion. JUSTICE ALBIN filed a concurrence.**

4

# SUPREME COURT OF NEW JERSEY
## A-47 September Term 2020
## 085132

State of New Jersey,

Plaintiff-Respondent,

v.

Laura Gonzalez,

Defendant-Appellant.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided | Revised |
|--------|---------|---------|
| October 26, 2021 | February 8, 2022 | August 8, 2022 |

Margaret McLane, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Margaret McLane, of counsel and on the briefs, and Richard Sparaco, Designated Counsel, on the briefs).

Steven K. Cuttonaro, Deputy Attorney General, argued the cause for respondent (Andrew J. Bruck, Acting Attorney General, attorney; Steven K. Cuttonaro, of counsel and on the briefs, and Paul H. Heinzel, Assistant Somerset County Prosecutor, on the briefs).

Joseph Hayden argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey (Pashman Stein Walder Hayden, attorneys; CJ Griffin, on the brief).

1

Lauren Gottesman, of the New York bar, admitted pro hac vice, argued the cause for amicus curiae The Innocence Project (Dechert, attorneys; Lauren Gottesman, of counsel and on the brief, J. Ian Downes, Rose Marie Wong, of the Pennsylvania bar, admitted pro hac vice, Arif H. Ali, of the New York and District of Columbia bars, admitted pro hac vice, and Lindsay N. Zanello, of the New York bar, admitted pro hac vice, on the brief).

JUSTICE SOLOMON delivered the opinion of the Court.

In 2017, police questioned defendant Laura Gonzalez -- after providing her with her Miranda warnings[1] -- in connection with the discovery that the infant for whom she served as a nanny, Tommy[2], had two fractures in his right leg and one in his left. In the middle of the interview, defendant asked, "But now what do I do about an attorney and everything?" Rather than seek clarification, the interviewing detective merely advised defendant, "That is your decision. I can't give you an opinion about anything." Ultimately, defendant admitted to abusing Tommy and, at the interviewing detective's suggestion, wrote his parents an apology note.

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

[2] We continue the Appellate Division's use of a pseudonym to protect the child victim.

2

Defendant was charged with endangerment and aggravated assault. She moved to suppress portions of her statement and the note, arguing that she invoked her right to counsel during her interview. The trial court denied defendant's motion, reasoning that defendant's statement did not rise to the level of being an assertion of her right to counsel -- not even an ambiguous assertion of that right, which triggers a duty for the interviewing officer to seek clarification under New Jersey law. State v. Reed, 133 N.J. 237, 253 (1993). The jury found defendant guilty of second-degree endangering the welfare of a child and simple assault.

Defendant appealed, challenging the denial of her suppression motion, as well as certain evidentiary determinations and jury instructions by the trial court. The Appellate Division affirmed defendant's conviction.

We now reverse the judgment of the Appellate Division and remand the matter for further proceedings. We conclude that defendant's question about the attorney was an ambiguous invocation of her right to counsel and that, under settled New Jersey law, see, e.g., ibid., the detective was required to cease questioning and clarify whether defendant was requesting counsel during the interview. And, because the State played defendant's recorded statement at trial and read the apology note -- written at the detective's suggestion -- to the jury, we find the error to be harmful. We also find plain error in the trial

court's admission of certain challenged evidence, and we provide guidance for the proceedings on remand.

I.

In January 2017, Seth and Lisa B. hired defendant as an in-home nanny to help care for their son. At that time, Lisa was pregnant with the couple's second child, Tommy, who was born a month later. Lisa returned to work in the spring of 2017, and defendant was then home alone with the two children while the parents were at work.

In October 2017, the couple noticed Tommy favoring his right leg. Approximately one month later, while Lisa was away on business, Seth told her Tommy was crying more than usual and did not seem himself. Defendant also expressed concerns over Tommy's behavior. When Lisa returned from her trip, she and Seth took Tommy to his pediatrician and an orthopedist. Neither doctor detected any issues with Tommy.

On Thanksgiving morning, Tommy cried hysterically whenever Lisa tried to pick him up or touch his leg. Later that day, the parents traveled to Long Island to visit family, and, while there, took Tommy to a pediatrics office, where he was seen by Dr. Aliah Khan. An x-ray revealed a fracture of Tommy's right femur, which Dr. Khan treated with a splint. After the parents returned to their family's home in Long Island, Dr. Khan called and advised

4

them that Tommy's left tibia revealed a "corner fracture," and that he had notified the New York Department of Child Protection Services. Dr. Khan insisted that the parents take Tommy to the hospital.

The couple took Tommy to Morristown Memorial Hospital where further testing revealed a third, healing fracture of Tommy's right tibia. The New Jersey Department of Child Protection and Permanency (DCPP) was notified; DCPP, in turn, notified the Somerset County Prosecutor's Office. Detective Iris Reyes of the Somerset County Prosecutor's Office met the parents at the hospital and interviewed them about Tommy's injuries. Detective Reyes interviewed defendant at the Somerset County Prosecutor's Office a few days later.[3]

Detective Reyes advised defendant of her Miranda rights in English before switching to Spanish. Defendant also received and signed a Miranda form written in Spanish. Defendant agreed to provide a videotaped statement after waiving her Miranda rights.

Defendant initially denied any responsibility for Tommy's injuries. As the interview continued, however, Detective Reyes told defendant that video surveillance cameras in the home captured footage of her interactions with

---

[3] Detective Reyes speaks Spanish fluently and conducted the interview primarily in Spanish. Defendant's statement was later translated into English.

5

Tommy; in truth, no cameras existed in the home.  During the interview, before defendant made any incriminating statements, the following colloquy occurred:

> Detective Reyes:  I don't know what could happen. And I'm not going to lie to you[,] but yes[,] I can say that if you lie --
>
> Defendant:  Uh-humm.
>
> Detective Reyes:  The situation is going to get worse.
>
> Defendant:  But now what do I do about an attorney and everything?
>
> Detective Reyes:  That is your decision.  I can't give you an opinion about anything.
>
> Defendant:  Yes, but --
>
> Detective Reyes:  The only thing I can say to you is, that telling the truth --
>
> Defendant:  Uh-humm.
>
> Detective Reyes:  You will have a better option by telling the truth.
>
> Defendant:  Ok.
>
> Detective Reyes:  Than lying.
>
> Defendant:  No, there is nothing else, [Detective].

After, Detective Reyes suggested defendant was supplying information "little piece by little piece," and the following colloquy ensued:

> Defendant: You're going to help me with an attorney.
>
> Detective Reyes: I'm going to help you with an attorney? Or no --
>
> Defendant: Yes, (inaudible).
>
> Detective Reyes: Oh no, that is your decision what you want to do.
>
> . . . .
>
> Defendant: I don't know I need you to guide me, I am honest, I don't know.
>
> Detective Reyes: I can't guide you, all that [I] want is to know what happened to the boy. And I can see that you are not helping.

Defendant acknowledged that she was "full of anger" and admitted to shaking Tommy aggressively, swinging him to get him to stop crying, hitting him in the head, suffocating him with her hands, and pulling his legs out from under the highchair whenever he did not sit properly. Defendant also admitted to throwing Tommy onto his play mat and throwing water over his face. Near the end of the interview, Detective Reyes asked defendant if she wanted to write the B. family a note. Defendant agreed and wrote the following:

7

Lisa, I'm so sorry about what happened. I never been happy in your home. I stayed because I have a family to feed and to -- me, too. I never thought to been in the monster -- monster that I transformed. My life will never be the same and yours, either. I hope God forgive me and all that I did. It's no apology that can change that but I hope that you can understanding I never feel like family.

The interview concluded shortly thereafter.

Later, a Somerset County indictment charged defendant with second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(2), and second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1).

Before trial, defendant moved to suppress portions of her statement to Detective Reyes and the note to the parents, arguing that both were made after she invoked her right to counsel. Following a Miranda hearing, the court denied defendant's motion to suppress, finding that defendant did not equivocally invoke her right to an attorney at any point during the interview. The court further reasoned that because defendant only requested advice on how to obtain a lawyer and never made an ambiguous assertion of her right to counsel, Detective Reyes was not obliged to clarify whether defendant wanted an attorney.

At trial, the State played defendant's recorded statement, read the note aloud, and provided the jury with a transcript of defendant's statement

8

translated into English. Also relevant to this appeal were statements made during trial by Lisa and Seth over defense counsel's objections, and the testimony of Dr. Gladibel Medina, the State's expert in general pediatrics with a subspecialty in child abuse pediatrics.

Specifically, on direct examination, Lisa testified about what occurred the day she and Seth brought Tommy to be examined by Dr. Khan. Lisa testified that upon discovering the fracture of Tommy's left leg, Dr. Khan told her that "the Department of Child Protection Services had been called because it was clear child abuse." Then, when Lisa was asked whether Dr. Khan told her anything about the fracture, defense counsel objected on hearsay grounds.

The court overruled the objection, finding that the hearsay statements were admissible as statements made for purposes of medical diagnosis or treatment under N.J.R.E. 803(c)(4). In response to the question, Lisa testified that "[t]hey said the way it was done was intentional. There is no way that there is an accident. [Ninety-nine] percent of the cases of this was intentional abuse." Following Lisa's cross-examination, the court instructed the jury as follows:

> [Y]ou heard from this witness . . . regarding certain statements that Doctor Khan gave to her.
>
> [T]hose statements were admitted not for the truth of the matter asserted but to explain the actions that this

9

witness took subsequent to hearing those statements from Doctor Khan, as for any steps she may have taken included, but not limited to, . . . for treatment of [Tommy].

So they were not admitted for the truth of the matter asserted or the statements asserted.

Seth B. then testified that after Dr. Khan informed him that Tommy had another fracture, Seth asked whether the crib could be responsible for Tommy's injuries. Seth then testified that Dr. Khan responded, "no, this is not a crib. This is, basically, textbook child abuse." Defense counsel objected at side bar, and the court agreed to strike Seth's testimony and gave the following instruction to the jury:

> [Y]ou just heard from this witness regarding what he quoted as textbook child abuse. That answer is stricken. You are not to consider it in any of your deliberations. It is purely hearsay. It is an opinion that he is not qualified to give nor is he qualified to tell you what someone else said. You are not to consider that at all. It is stricken from the record.

The judge then asked the jurors if they could follow his instructions, to which the jury responded in the affirmative.

Dr. Medina testified as the State's expert in pediatrics with specialized knowledge in child abuse. When asked whether she had an opinion "within a reasonable degree of medical certainty" as to what caused the injuries to Tommy's right femur, Dr. Medina testified that

10

the only mechanism of trauma that was reported on the records that I reviewed was provided by the other caregiver, who was the nanny in the home, where she reported that she had pulled on the child's leg, thrown the child across 2 to 3 feet, hit the child. All of that may involve twisting-type forces, depending on how the infant is handled. Of course, all of that is handling of an infant beyond routine caregiving. So that mechanism, potential mechanism, could have caused a . . . twisting-type force applied to his extremity to cause the right femur to spiral fracture.

When asked whether she had an opinion as to what caused the injuries to Tommy's left tibia, Dr. Medina said that the "mechanism provided by the nanny . . . of pulling the legs and throwing the child could definitely account for the fracture and the symptoms that he experienced during that period of time."

Lastly, when asked whether she had an opinion about what caused the injuries to Tommy's right tibia, Dr. Medina responded that

[t]he injury . . . is consistent with trauma . . . and the nanny, again, provided a history, not of when the incidents occur[red], but that while caring for this child she had thrown the child, hit the child, pulled on his legs, and that fracture could have happened by that mechanism of trauma that was provided by that caregiver.

. . . .

[N]ormal caregiving activity does not involve pulling, twisting, -- or, of course, not throwing -- of a child in

11

that manner. Routine caregiving, changing diapers, dressing the kid, etc., is not physically harmful to the child . . . . Routine infant handling does not break bones in an infant, and that is why you know that the forces described by the third caregiver are beyond what was required for handling in this case.

Defense counsel did not object at trial to any of the above testimony from Dr. Medina.

The jury found defendant guilty of second-degree endangering the welfare of a child and not guilty of second-degree aggravated assault but guilty of the lesser-included offense of simple assault. Defendant was sentenced to nine years in prison on the endangering count and a concurrent term of one-hundred-eighty days' imprisonment on the simple assault count.

## II.

Defendant appealed, and the Appellate Division affirmed both the trial court's decision to deny defendant's motion to suppress and the trial court's rulings as to the disputed testimony at trial. In doing so, the court relied on its opinion in State v. Messino, 378 N.J. Super. 559, 573, 578 (App. Div. 2005), where it held that the suspect's question to police -- "Do you think I need a lawyer?" -- did not amount to even an ambiguous request for a lawyer. Ibid.

As to the testimony elicited during trial, the court found that the trial court properly allowed Lisa to testify under N.J.R.E. 803(c)(4) that Dr. Khan

12

said Tommy's fracture was "clear child abuse," especially in light of the trial court's curative instruction limiting the jury's use of the information. The Appellate Division further concluded that the trial court properly struck Seth's inadmissible statements and issued a proper curative instruction. As to Dr. Medina's testimony, the court found her statements to be proper under N.J.R.E. 704. The Appellate Division also noted "that to the extent inadmissible evidence was heard by the jury . . . none of the testimony raise[d] a reasonable doubt that its admission led the jury to a result it otherwise would not have reached."

We granted defendant's petition for certification, 245 N.J. 466 (2021), limited to whether defendant's statement and letter of apology should have been suppressed because defendant sufficiently invoked her right to counsel, as well as whether the trial court erred in admitting testimony by Dr. Medina regarding ordinary caregiving; in admitting testimony by Seth and Lisa as to what Dr. Khan told them; and in the form of its cautionary instruction regarding hearsay testimony by Seth. We granted leave to participate as amici curiae to the Association of Criminal Defense Lawyers of New Jersey (ACDL) and the Innocence Project.

Defendant asks this Court to reverse the Appellate Division's decision denying her motion to suppress portions of her statement. The essence of defendant's and amici's argument is that defendant's statements amounted to an ambiguous request for counsel, triggering defendant's right to have the interrogation cease and requiring Detective Reyes to clarify whether defendant was indeed invoking her right to counsel.

Defendant further contends that Dr. Medina wrongfully offered her opinion on defendant's guilt. Additionally, amici assert that the trial court denied defendant her right to a fair trial because opinion evidence on the ultimate issue of child abuse invaded the province of the jury. Lastly, defendant argues that Dr. Medina's expert opinion that "normal caregiving does not cause fractures simply stated the obvious and was not beyond the ken of the jury."

The State claims that the totality of the circumstances demonstrate that defendant's mention of an attorney was not an equivocal request for counsel. Rather, according to the State, defendant was merely asking for guidance on how to obtain an attorney for subsequent proceedings. The State further contends that Dr. Medina's testimony did not improperly usurp the province of the jury. Additionally, the limiting instruction following Lisa's testimony

adequately instructed the jury not to consider her testimony for its truth, but rather to show the steps taken to treat Tommy. Lastly, the State argues that the trial court properly remedied Seth's inadmissible testimony with a curative instruction.

## IV.

We begin by considering defendant's motion to suppress. We conclude that it should have been granted because defendant had ambiguously invoked her right to counsel, triggering the interviewing officer's duty to seek clarification and to end the interview if necessary.

## A.

Defendant's suppression motion relies upon "[t]he right against self-incrimination . . . guaranteed by the Fifth Amendment to the United States Constitution and this state's common law, now embodied in statute, N.J.S.A. 2A:84A-19, and evidence rule, N.J.R.E. 503." State v. A.M., 237 N.J. 384, 396 (2019) (quoting State v. S.S., 229 N.J. 360, 381-82 (2017)). We recognize that our review requires that we "defer to the factual findings of the trial court . . . supported by sufficient evidence in the record," because a trial court's decision is influenced by the opportunity to hear and see the witnesses. State v. Hubbard, 222 N.J. 249, 262 (2015). However, because the issue here turns on a question of law, we review it de novo. Id. at 263.

15

Our review begins with the constitutional safeguards established by the United States Supreme Court to ensure that a person subject to custodial interrogation is "adequately and effectively apprised of his rights." Miranda v. Arizona, 384 U.S. 436, 467 (1966). In the absence of those "[p]roper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures." Ibid.

Hence, where an "individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." Id. at 473-74. Similarly, "[i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present." Id. at 474.

"The United States Supreme Court has drawn a strict line to identify what will qualify as a request for counsel." State v. Alston, 204 N.J. 614, 620 (2011); see Smith v. Illinois, 469 U.S. 91, 95 (1984) (noting the Fifth Amendment right to counsel is a "rigid prophylactic rule" (internal quotation marks omitted)). Under the federal bright-line rule, officers must stop questioning a suspect only when the suspect's request for counsel is "unambiguous or unequivocal." Davis v. United States, 512 U.S. 452, 461-62 (1994). However, if a suspect makes an ambiguous or equivocal statement

regarding the right to counsel, officers are under no obligation to stop questioning him. Id. at 462.[4]

Our disengagement from the United States Supreme Court's "bright line rule" began with State v. Wright, 97 N.J. 113 (1984), decided before the U.S. Supreme Court's decision in Davis. In Wright, we held that a suspect's statement that, "I won't sign any more deeds [or waivers] without my lawyer present," amounted to an invocation of his right to counsel, and "[a]t the very least . . . the interrogating agent was under an obligation to clarify the meaning of [the suspect's] remark before proceeding with further questioning. 97 N.J. at 119-20 (first and third alterations in original).

Following Davis, in State v. Chew, we determined that the suspect made an equivocal request for counsel when he asked his mother to contact his attorney as police removed him from his home. 150 N.J. 30, 63 (1997). Underscoring the significance of the right to counsel, we held in Chew that "[b]ecause the right to counsel is so fundamental, an equivocal request for an attorney is to be interpreted in a light most favorable to the defendant." Ibid. Accordingly, we rejected the federal standard enunciated by the U.S. Supreme

---

[4] The Court did note, however, that "when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney." Davis, 512 U.S. at 461.

17

Court in Davis and found "it prudent to continue to apply our precedent" requiring that interrogators conduct an appropriate inquiry into a suspect's ambiguous invocation of the right to counsel. Ibid.

Explaining further New Jersey's more flexible approach, Alston, 204 N.J. at 621, we held in State v. Reed that "a suspect need not be articulate, clear, or explicit in requesting counsel; any indication of a desire for counsel, however ambiguous, will trigger entitlement to counsel." 133 N.J. 237, 253 (1993). A suspect therefore, does not need to express their desire to terminate an interrogation with the "utmost of legal precision." State v. Bey, 112 N.J. 45, 65 (1988).

This Court provided guidance in Alston and reaffirmed our precedent that, in situations where "a suspect's statement 'arguably' amount[s] to an assertion of Miranda rights," conducting a follow-up inquiry is the only way to ensure that a suspect's waiver of their right was knowing and voluntary. 204 N.J. at 621-23. We instructed that where the suspect's "statements are so ambiguous that they cannot be understood to be the assertion of a right, clarification is not only permitted but needed." Id. at 624. In situations where clarification is required, substantive questioning should resume only after "the suspect makes clear that he is not invoking his Miranda rights." State v. Johnson, 120 N.J. 263, 283 (1990) (quoting Wright, 97 N.J. at 119 n.4).

18

In Alston, we ultimately concluded that the suspect's statement "should I not have a lawyer?" was a request for advice on seeking counsel rather than an "assertion of a right, ambiguous or otherwise." 204 N.J. at 626. There, after the suspect waived his Miranda rights orally and in writing, the following exchange occurred:

> Alston: I feel like I'm signing my life away.
>
> Detective: Not signing your life away.
>
> Alston: Should I not have a lawyer in here with me?
>
> Detective: You want a lawyer?
>
> Alston: No, I am asking you guys, man. I don't -- I'm just -- I see you guys, man.
>
> Detective: I can't make you.
>
> Alston: Sir, if I did want a lawyer in here with me how would I be able to get one in here with me?
>
> Detective: That's on -- that's on you. If you want a lawyer, then we -- stop and you going to get your lawyer. That's why he read that clearly to you and your waiver. If you want to stop at this time then we stop at this time. It's either yes or no . . . .
>
> Alston: I'm already waist-deep, why?
>
> Detective: Huh?
>
> Alston: I'm already waist deep about to drown, why?
>
> Detective: You've got to answer yes or no.

19

Alston: I already did.

Detective: Do you want a lawyer? No -- that's what you're saying?

Alston: When I go to court, I guess.

Detective: Do -- do you want to continuing answering questions -- answering our questions?

Alston: Sure. Why not?

[Id. at 618.]

Our holding emphasized that when the detective asked whether Alston wanted a lawyer, he responded "No, I am asking you guys, man." Id. at 626. We found that "[n]othing in that response amounted to even an ambiguous request for counsel; rather, it was an emphatic 'no' followed by a continued effort to secure advice and guidance from the police about what they thought [his] best course of action was at the time." Ibid. Lastly, we noted that since officers are under no obligation to give a suspect advice about whether he should assert any of his rights, the detective did not err in refusing to do so. Id. at 628.

### B.

Applying the above principles of our jurisprudence to the present appeal, we find that defendant's first mention of counsel, "[b]ut what do I do about an attorney and everything?" was an ambiguous invocation of her right to counsel that required the detective to cease all questioning and seek clarification.

20

Here, unlike in Alston -- where the suspect asked the interrogating detectives "should I not have a lawyer?" -- defendant did not seek an opinion about whether she should have a lawyer present, but rather inquired about the availability of counsel. Additionally, defendant's vague query here made it unclear whether she wanted an attorney present at that time or in the future. Thus, defendant's statement was "arguably" a request for counsel.

Secondly, although in Alston we determined that the suspect's statement "should I not have a lawyer" was "not an assertion of a right, ambiguous or otherwise," the officer nonetheless clarified by asking "You want a lawyer," to which the suspect replied, "No, I am asking you guys, man." 204 N.J. at 626. Here the detective responded to defendant's remark "[b]ut what do I do about an attorney and everything," by saying, "I can't give you an opinion about anything," rather than seeking clarification. Defendant's statement was at least ambiguous, and the detective failed to clarify what defendant meant. Although the detective was under no obligation to give defendant any advice about obtaining counsel, she was required to cease the interrogation and ask follow-up questions to clarify defendant's obstruse statement regarding counsel.

"Because the right to counsel is so fundamental, an equivocal request for an attorney is to be interpreted in a light most favorable to the defendant."

21

Chew, 150 N.J. at 63. We therefore interpret defendant's question, "[b]ut what do I do about an attorney and everything," to be an equivocal invocation of the right to counsel and, since the detective made no further inquiry, all portions of defendant's statement made thereafter,[5] as well as defendant's note of apology to the parents, should have been excluded at trial.

V.

A.

Turning to other evidentiary issues raised by this appeal -- Dr. Medina's expert testimony, Lisa's testimony about statements by Tommy's treating doctor, and the trial court's instructions regarding Seth's hearsay testimony -- we first acknowledge that "[t]he decision to admit or exclude evidence is one firmly entrusted to the trial court's discretion." State v. Scott, 229 N.J. 469, 479 (2017) (quoting Estate of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010)). Evidentiary decisions are therefore reviewed by appellate courts under the deferential abuse of discretion standard, Hanges, 202 N.J. at 383-84, and "we do not set such rulings aside unless it appears that 'there has been a clear error of judgment,'" State v. Prall, 231 N.J. 567, 580 (2018) (quoting State v. J.A.C., 210 N.J. 281, 295 (2012)). In other words, "an

---

[5] We therefore need not consider in detail the later problematic exchange recounted above.

22

appellate court should not substitute its own judgment for that of the trial court unless 'the trial court's ruling was so wide of the mark that a manifest denial of justice resulted.'" State v. Singh, 245 N.J. 1, 13 (2021) (internal quotation marks omitted) (quoting State v. Brown, 170 N.J. 138, 147 (2001)).  However, our review of a trial court's evidentiary rulings does not end "when we find an abuse of discretion; rather, we must then determine whether any error found is harmless or requires reversal." Prall, 231 N.J. at 581.

"When a defendant does not object to an alleged error at trial, such error is reviewed under the plain error standard." Singh, 245 N.J. at 13.  In those cases, "an unchallenged error constitutes plain error if it was 'clearly capable of producing an unjust result.'" Ibid. (quoting R. 2:10-2).  Such an "error will be disregarded unless a reasonable doubt has been raised whether the jury came to a result that it otherwise might not have reached." Ibid.  (quoting State v. R.K., 220 N.J. 444, 456 (2015)).

B.

With respect to the expert testimony by Dr. Medina, N.J.R.E. 702 provides that expert testimony is admissible "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue."  The expert witness must have sufficient expertise to offer the intended testimony.  State v. B.H., 183 N.J. 171, 194

23

(2005). Additionally, "[a]s gatekeepers, trial judges must ensure that expert evidence is both needed and appropriate, even if no party objects to the testimony." State v. Sowell, 213 N.J. 89, 99-100 (2013). And witnesses may not base their testimony on inadmissible evidence.[6] See State v. Frisby, 174 N.J. 583, 592 (2002) (finding that the defendant's trial was tainted by a testifying witness's reliance on inadmissible evidence). Applying those principles to the present case, we conclude that Dr. Medina relied on inadmissible evidence from defendant's statement and that admission of her testimony constituted plain error, requiring reversal.

When asked her opinion as to what caused Tommy's injuries, Dr. Medina referred to defendant's statement that "she pulled on the child's leg, [threw] the child across 2 to 3 feet, [and] hit the child." Although defendant did not object to Dr. Medina's testimony at trial, all of those admissions were made after defendant ambiguously invoked her right to counsel, and therefore Dr. Medina was not permitted to mention those portions of her statement before the jury or to consider them in formulating her expert opinion. Because Dr. Medina therefore relied on impermissible evidence in forming her opinion

---

[6] Although defendant does not challenge the admissibility of Dr. Medina's testimony that references defendant's statement, we find it necessary to address this issue in light of our decision to suppress portions of defendant's statement.

as to how Tommy developed his injuries, see ibid., we find the admission of Dr. Medina's testimony to be plain error.

For completeness, we mention that Dr. Medina, an expert in general pediatrics with a subspecialty in child abuse pediatrics, should not have been permitted to opine on the obvious when noting that "normal caregiving" doesn't involve throwing or pulling a child's legs, because that is a subject within the ken of the average juror. See State v. Sowell, 213 N.J. 89, 104-05 (2013) (finding that expert testimony that relates to straightforward facts "encroache[s] on the jury's fact-finding role"); accord State v. Cain, 224 N.J. 410, 426-27 (2016). It was inadmissible.[7]

## C.

Turning to the hearsay testimony of Lisa and Seth about what Dr. Khan told them, which is challenged by defendant, hearsay testimony is inadmissible unless an exception to the hearsay rule applies. N.J.R.E. 802. Even if a hearsay exception applies, the testimony may still "be excluded if its probative value is substantially outweighed by the risk of . . . [u]ndue prejudice." N.J.R.E. 403(a).

---

[7] In light of our decisions to exclude portions of defendant's statement and Dr. Medina's testimony, we need not reach defendant's claim that Dr. Medina offered improper opinion testimony on the ultimate issue of defendant's guilt.

That said, we recognize that "[t]rials are not perfectly orchestrated productions." State v. Yough, 208 N.J. 385, 388 (2011). A curative instruction that is "firm, clear, and accomplished without delay" can be an appropriate remedy to a trial court's error in admitting proscribed evidence, Prall, 231 N.J. at 586 (quoting State v. Vallejo, 198 N.J. 122, 134 (2009)), because the jury is presumed to follow the court's instructions, State v. Burns, 192 N.J. 312, 335 (2007).

We conclude that the trial court erred in admitting Lisa's inflammatory testimony regarding what Dr. Khan told her about Tommy's injuries. Specifically, Lisa testified that Dr. Khan said, "it was clear child abuse" and "the way it was done was intentional. There is no way that there is an accident. [Ninety-nine] percent of the cases of this was intentional abuse." N.J.R.E. 803(c)(4) admits hearsay testimony that is "reasonably pertinent to, medical diagnosis or treatment" and describes "past or present symptoms or sensations; their inception; or their general cause." In the context of a case such as this, the rule "is directed at patients and cannot be used to introduce hearsay statements by physicians." Biunno, Current N.J. Rules of Evidence, cmt. on N.J.R.E. 803(c)(4) (2021) (citing In re Civil Commitment of G.G.N., 372 N.J. Super. 42, 57 (App. Div. 2004)). Further, N.J.R.E. 803(c)(4) does not permit testimony "as to the cause of physical symptoms." Ibid.

26

The rule against hearsay precludes the admission of a statement attributed to an out of court declarant "to prove the truth of the matter asserted in the statement." N.J.R.E. 801(c). The trial court admitted Lisa's testimony as a hearsay exception offered for the limited purpose of medical diagnosis and treatment, under N.J.R.E. 803(c)(4). Indeed, "[i]t has long been the rule in New Jersey that the declarations of a patient as to his condition, symptoms, and feelings made to his physician for the purpose of diagnosis or treatment are admissible in evidence as an exception to the hearsay rule." Cestero v. Ferrara, 57 N.J. 497, 501 (1971)); accord Prioleau v. Kentucky Fried Chicken, Inc., 434 N.J. Super. 558, 586 (App. Div. 2014); see also Gonzales v. Hugelmeyer, 441 N.J. Super. 451, 462 (App. Div. 2015) (allowing a physician to testify under N.J.R.E. 803(c)(4) as to comments made by his patient regarding the patient's back pain).

But, here, Lisa testified to statements that Dr. Khan made to her about the cause of Tommy's symptoms, not statements made to Dr. Khan for the purpose of his medical diagnosis or treatment. Hence, N.J.R.E. 803(c)(4) does not apply, and the trial court abused its discretion by admitting Lisa's hearsay statement about what Dr. Khan said. We therefore need not consider whether the statement's probative value is substantially outweighed by the risk of undue prejudice under N.J.R.E. 403.

27

Conversely, we find that the trial court promptly struck Seth's testimony that Dr. Khan told him "[t]his is, basically, textbook child abuse," and issued "firm, clear, and prompt" curative instructions.

## VI.

The trial court's errors in admitting defendant's statements after her equivocal invocation of her right to counsel, Lisa's testimony about statements made to her by Dr. Khan, and Dr. Medina's testimony about matters within the ken of the average juror constitute errors "clearly capable of producing an unjust result," R. 2:10-2, entitling defendant to a new trial. We therefore reverse the judgment of the Appellate Division, and remand the matter to the trial court for further proceedings consistent with this opinion.

CHIEF JUSTICE RABNER and JUSTICES ALBIN, PATTERSON, FERNANDEZ-VINA, and PIERRE-LOUIS join in JUSTICE SOLOMON's opinion. JUSTICE ALBIN filed a concurrence.

28

State of New Jersey,

Plaintiff-Respondent,

v.

Laura Gonzalez,

Defendant-Appellant.

JUSTICE ALBIN, concurring.

I join the opinion of the Court in full. I write to highlight two other interrogation techniques used by Detective Reyes in questioning Gonzalez -- one which is prohibited under already existing principles of law, and another which this Court has yet to condemn but will have to address in some future case. Both issues concern the use of lies by the police during an interrogation -- and whether that practice should continue to be sanctioned by our courts.

I.

In administering Gonzalez her Miranda rights, Detective Reyes correctly advised her that "everything may be used against you in a court of law." See State v. L.H., 239 N.J. 22, 42 (2019) (noting that a suspect must be warned "that anything he says can be used against him in a court of law" (quoting Miranda v. Arizona, 384 U.S. 436, 479 (1966))). Because Miranda requires a

1

police officer, before questioning, to tell a suspect that anything he says can be used against him, the officer, during questioning, "cannot directly or by implication tell [the] suspect that his statements will not be used against him." Id. at 44. That is so because "[a] police officer cannot directly contradict, out of one side of his mouth, the Miranda warnings just given out of the other." State in Interest of A.S., 203 N.J. 131, 151 (2010) (quoting State v. Pillar, 359 N.J. Super. 249, 268 (App. Div. 2003)).

We have held that false assertions, such as telling a suspect that "the truth would be helpful" and "set [him] free," L.H., 239 N.J. at 47-48 (alteration in original), and that answering questions "would actually benefit her," A.S., 203 N.J. at 151, contravene the Miranda warnings. See also State v. Puryear, 441 N.J. Super. 280, 298-99 (App. Div. 2015) (finding a Miranda violation when the interrogating officer told the suspect that he "could not hurt himself and could only help himself by providing a statement").

In this case, in clear violation of our jurisprudence, Detective Reyes told Gonzalez "the[] truth . . . sets everything free[]"; "that truth is going to help you in the long run"; "you are going to need that consideration that you told the truth"; "[y]ou can get into something that you can get yourself out of if you tell the truth"; and "[t]ell[ing] me [the] truth. . . . is going to help you." Those statements, and others, flatly contradicted the Miranda warnings. The

2

statements Gonzalez made to Detective Reyes did not help her or set her free but were used against her by the prosecution.

Defense counsel did not raise the issue, and therefore it is not addressed in the Court's opinion.  Nevertheless, law enforcement officers are on notice that they cannot "disarm the Miranda warnings during the interrogation by falsely asserting or suggesting that a suspect's words will be used in his favor and not against him in court."  L.H., 239 N.J. at 47-48.  The failure to abide by that simple dictate may lead to suppression of a suspect's statement.

## II.

In a future case, when the issue is joined, this Court will have to reassess its jurisprudence, which "gives officers leeway to tell some lies during an interrogation."[1]  See id. at 44 (citing State v. Galloway, 133 N.J. 631, 655 (1993); State v. Miller, 76 N.J. 392, 403-04 (1978)); see also State v. Baylor, 423 N.J. Super. 578, 588-89 (App. Div. 2011) (holding that police may use "deception or trickery" to induce a confession so long as it does not offend due process and is not calculated to produce a false confession); State v. Manning, 165 N.J. Super. 19, 30-31 (App. Div. 1978) (same).  We have to determine whether sanctioning deception and trickery in the interrogation process offends

---

[1]  In L.H., we held that false promises of leniency are "impermissible lies" that may "have the capacity to overbear a suspect's will."  See L.H., 239 N.J. at 44.

3

judicial integrity and whether the cost of potentially eliciting false confessions outweighs the benefits of eliciting a number of true confessions.

In this case, in an effort to secure a confession from Gonzalez that she physically abused the child in the B. home, Detective Reyes told her that surveillance cameras captured her conduct, suggesting that she was caught committing the crime. No surveillance cameras, however, were installed in the home.

Justice Brandeis famously said that "[o]ur Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example." Olmstead v. United States, 277 U.S. 438, 485 (1928) (Brandeis, J., dissenting). When deceptive interrogation tactics are sanctioned by our courts, what is the lesson conveyed to the public -- that law enforcement officers can lie to a suspect, but when a suspect lies to the police, it is a crime? See N.J.S.A. 2C:28-3. One day, this Court will have to decide whether the continued use of lies and trickery is a constitutionally permissible practice -- whether it is a principled and sufficiently reliable means of inducing a truthful confession from a suspect.

The use of lies in the interrogation process is not just an ethical concern about whether the ends justify the means. The use of lies may overbear the will of a suspect, overcome the suspect's ability to resist the psychologically

4

coercive pressures inherent in the interrogation process, and, in some instances, elicit a false confession. See State v. Patton, 362 N.J. Super. 16, 18, 46 (App. Div. 2003) (recognizing the inherently coercive nature of providing a suspect with a falsified eyewitness account of the crime).

Courts have come to recognize that the use of false statements by interrogators has the capacity to overbear the will of a suspect and induce not just trustworthy confessions, but also false confessions. One court, relying on social science studies, has noted that "the presentation of false information through confederates, witnesses, counterfeit test results," and other means "renders individuals more vulnerable to manipulation" and "has been shown to increase the rate of false confessions." State v. Perea, 322 P.3d 624, 642-43 (Utah 2013). Other courts have come to the same conclusion about the dangers of false statements inducing false confessions. See, e.g., State v. Baker, 465 P.3d 860, 878-79 (Haw. 2020) (recognizing "that false claims of physical evidence result in an unsettling number of false or involuntary confessions" and that "misrepresentations about the existence of incontrovertible physical evidence that directly implicates the accused is an exceptionally coercive interrogation tactic and its use is a strong indicator that the suspect's statement was involuntary"); United States v. Rodgers, 186 F. Supp. 2d 971, 977 (E.D. Wis. 2002) ("Notwithstanding that courts have been

5

tolerant of police lies about evidence, any form of police trickery in the interrogation room merits close judicial scrutiny.").

Although most courts will not automatically suppress a confession elicited by an interrogator's false statements, such tactics are weighed in determining whether a suspect rendered an involuntary statement. See, e.g., Commonwealth v. DiGiambattista, 813 N.E.2d 516, 524-25 (Mass. 2004) (noting that although "false statements about the evidence against the suspect do not automatically render the suspect's confession involuntary, . . . research has identified such use of false statements as a significant factor that pressures suspects into waiving their rights and making a confession" (citing, among other articles, Richard J. Ofshe & Richard A. Leo, The Decision to Confess Falsely:  Rational Choice and Irrational Action, 74 Denv. U. L. Rev. 979, 1008-13 (1997))); State v. Cooper, 217 N.W.2d 589, 597 (Iowa 1974) ("Deception of any nature by representatives of the state cannot be condoned. However, we conclude deception standing alone does not render a waiver of constitutional rights involuntary as a matter of law unless the deceiving acts amount to a deprivation of due process.").

Courts also have declared that law enforcement's use of lies during an interrogation is a practice inconsistent with the ideals of our criminal justice system. See, e.g., Ex parte Hill, 557 So. 2d 838, 842 (Ala. 1989) (finding that

6

police lying about evidence to compel a suspect to confess is "at odds with our concept of due process of law, and especially repugnant when used against suspects of diminished intellectual ability"); State v. Phelps, 696 P.2d 447, 452 (Mont. 1985) ("[W]e cannot condone the tactics of this officer who informed Phelps as to the existence of incriminating evidence when the evidence was inconclusive."); State v. Register, 476 S.E.2d 153, 158 (S.C. 1996) (stating that "the misrepresentation of evidence by police is a deplorable practice").

The United States Supreme Court too has expressed concern over the number of false confessions elicited during custodial interrogations, even without addressing the use of deception in the interrogation process. See Corley v. United States, 556 U.S. 303, 320-21 (2009). In Corley, the Court noted that "'[c]ustodial police interrogation, by its very nature, isolates and pressures the individual,' and there is mounting empirical evidence that these pressures can induce a frighteningly high percentage of people to confess to crimes they never committed." Ibid. (quoting Dickerson v. United States, 530 U.S. 428, 435 (2000)).

I understand that today is not the occasion to reckon with this issue. The issue must be timely raised, developed on a complete record, and fully briefed. It is nevertheless an issue of supreme importance because "life and liberty can be as much endangered from illegal methods used to convict those thought to

be criminals as from the actual criminals themselves." <u>See</u> <u>Spano v. New York</u>, 360 U.S. 315, 320-21 (1959).